

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-1-2004

# Ambartsoumian v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1961

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Ambartsoumian v. Atty Gen USA" (2004). *2004 Decisions.* Paper 114.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/114

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 03-1961
_____

GAREGIN AMBARTSOUMIAN;
NADIA AMBARTSOUMIAN;
KARINA AMBARTSOUMIAN;
RIMMA AMBARTSOUMIAN,
*Petitioners*

v.

JOHN ASHCROFT, ATTORNEY
GENERAL
OF THE UNITED STATES OF
AMERICA,
*Respondent*
_____

On Petition for Review of Orders of the
Board of Immigration Appeals
(Board Nos. A75-006-540;
A75-006-541;
A75-006-543; A75-559-426)
_____

Argued October 5, 2004

Before: SLOVITER, BECKER and
STAPLETON, *Circuit Judges*

(Filed: November 1, 2004)

STEVEN P. BARSAMIAN (ARGUED)
2021 Locust Street
Philadelphia, PA 19103

*Attorney for Petitioner*

PETER D. KEISLER
Assistant Attorney General, Civil
Division
ANTHONY W. NORWOOD
Senior Litigation Counsel
JENNIFER A. LEVINGS (ARGUED)
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044

*Attorneys for Respondent*

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge.*

This is a petition by Garegin
Ambartsoumian ("Garegin"), his wife
Nadia Ambartsoumian ("Nadia"), and their
two children, for review of an order of the
Board of Immigration Appeals (BIA)
denying them asylum, withholding of
removal, and protection under the
Convention Against Torture. It is, in a
way, a tale of two countries—the Ukraine
and Georgia. Garegin is a Georgian citizen
of Armenian and Ossetian parentage.
Nadia is a Ukrainian citizen and a Baptist.
The Ambartsoumians married in the
Ukraine in 1989, and spent much of the

next three years shuttling back and forth between their two native countries. They arrived in the United States in 1996, after a sojourn in Canada, and applied for asylum, claiming that they had faced persecution in both Ukraine and Georgia and would be persecuted in either country if obliged to return.

The case for persecution in the Ukraine is extremely weak. It is largely predicated on events that took place, and on policies and attitudes that existed, before the breakup of the Soviet Union and the establishment of an independent Ukraine. Except for an alleged beating in 1991 and a putative attempt to kidnap the Ambartsoumians' children in 1992, the record includes nothing more than sporadic veiled threats and a lack of economic opportunity in the Ukraine. The Ambartsoumians did adduce evidence that the climate in the Ukraine is inhospitable to Armenians. However, the record, including State Department reports on country conditions, reflects a total change in the governmental policies of the Ukraine since 1991, and nothing in the record suggests that the Ambartsoumians would now be persecuted in the Ukraine for either their ethnicity or their religious beliefs.

The case for persecution in Georgia seems more complicated in light of the fluid political situation in the North Caucasus and the continuing tensions in Abkhazia and South Ossetia.[1] The record contains evidence that in 1989 the Ambartsoumians received death threats from Georgian nationalists; that in 1990 both Nadia and Garegin were badly beaten; and that in 1992, upon his return from Ukraine, an attempt was made to conscript Garegin into the Georgian army. However, the Ambartsoumians' principal contention before us, supported by an expert witness—a professor specializing in the history and politics of the region—is that ethnic hostility toward Armenians and

---

[1]Abkhazia is a region in northwest Georgia, along the coast of the Black Sea and the Russian border. It declared independence in 1992, and was the scene of a bloody war in 1992-1993. *See A Matter of Russian Honour—Russia*, The Economist, Aug. 21, 2004, *available at* 2004 WL 62019076. South Ossetia is in north-central Georgia, bordering on the North Ossetia region of Russia. It declared independence from Georgia in 1990, intending to reunite with North Ossetia; this sparked a war lasting until 1992. *See Fact Sheet: Georgia*, Dep't St. Dispatch, May 9, 1994, at 296, *available at* 1994 WL 2848944. Currently, Russian and UN peacekeepers maintain truces in Abkhazia and South Ossetia, *see CIA World Factbook—Georgia*, *at* http://www.cia.gov/cia/publications/factbook/geos/gg.html, but the government of Georgia still does not control those areas, *see Putting Out More Flags—Georgia*, The Economist, July 24, 2004, *available at* 2004 WL 62018768.

2

religious hostility toward non-Orthodox Christians would now render the Ambartsoumians subject to persecution in Georgia.

The latest State Department Country Report in the record, for 1998, counters the expert's opinion. We therefore asked the parties to comment on the adequacy of the administrative record, given the current situation in Georgia, in light of our opinions in *Berishaj v. Ashcroft*, 378 F.3d 314, 328-31 (3d Cir. 2004), and *Gambashidze v. Ashcroft*, 381 F.3d 187, 193-94 (3d Cir. 2004). In these cases, we expressed our concerns about being forced to use stale administrative records to decide petitions seeking to avoid deportation to countries of origin where asylum applicants might be persecuted.

In response to our request for comment, the Attorney General reported that the Department of Justice has responded to *Berishaj* by implementing a new procedure pursuant to which the Office of Immigration Litigation (OIL), in consultation with its client agencies, now screens out and seeks to remand cases where records are out of date and not appropriate for judicial review. All OIL attorneys have been instructed to consider whether the record in each case assigned to them is so out of date as to justify a remand. If the record is stale, the OIL attorney is to bring the case to the attention of the Director of OIL, who may seek a remand as a matter of discretion. The factors that OIL will use in assessing old records include "(1) whether there have been pertinent, intervening events in the country of removal; and (2) whether the issues on review are 'time sensitive' in that changes in conditions over time may affect the resolution of the issues." The full text of the procedures are set forth in the Appendix to this opinion. We commend the Attorney General and OIL on this reform.

Notwithstanding the new procedures, the OIL concluded that the record in this case does not warrant a remand to the BIA. Concomitantly, the Ambartsoumians' counsel, at oral argument, agreed that the record before the agency was sufficient for this Court to consider, although he argued that it compelled us to reject the IJ's findings. Since both parties seem to agree that the staleness of the record does not present any difficulties here, we reach the merits of the persecution claims.

The government submits that the record does not compel the conclusion that there was past persecution, or that the Ambartsoumians will face persecution if returned to Georgia. For the reasons that follow, we agree. As will appear, important to this conclusion are the facts that: (1) the Ambartsoumians' expert, Dr. Ronald Suny, was too general and broad-brushed to overcome the 1998 Country Report's account of greatly improved conditions for Armenians in Georgia; (2) Suny acknowledged that the situation in Georgia had significantly improved and that the government was not a likely persecutor; and (3) the real problem was only that Georgia was a "weak state"

where Armenians are not popular.

For these reasons, the Petition for Review will be denied.

## I. The Legal Framework

The Attorney General may, in his discretion, grant asylum to any alien if he determines that the alien is a refugee. 8 U.S.C. § 1158(b)(1). To demonstrate that he or she is a refugee, an asylum applicant must establish that he or she is unable or unwilling to return to his or her native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). The burden of proving persecution is on the asylum applicant. 8 C.F.R. § 1208.13(a).

The Ambartsoumians' application for withholding of removal is based upon 8 U.S.C. § 1231(b)(3)(A), which forbids removal if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." To qualify for withholding of removal, the applicant must show "that it is more likely than not that he will face persecution if he is deported." *Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987)). This standard is stricter than the "well-founded fear" standard for asylum.

Because we find that the Ambartsoumians are not eligible for asylum, we need not consider their eligibility for withholding of removal under this stricter standard. *See Shardar v. Ashcroft*, 382 F.3d 318, 324 (3d Cir. 2004).

The standard for CAT protection is different from that for asylum or withholding of removal; it requires proof that the applicant is "more likely than not" to be tortured, 8 C.F.R. § 1208.16(c)(2), but does not require any showing that the torture is on account of any protected ground. *See Lukwago v. Ashcroft*, 329 F.3d 157, 183 (3d Cir. 2003).

The Immigration Judge denied the Ambartsoumians' requests for relief, but granted them voluntary departure. The Board of Immigration Appeals affirmed without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4).[2] Therefore, we review only the decision of the Immigration Judge. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002). Our review is limited by the "substantial evidence" standard, which states that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The determination that an asylum applicant faced past persecution, or

---

[2]In his brief, Ambartsoumian suggests that the Board's policy of affirming without opinion denies him due process. This argument is foreclosed by our recent decision in *Dia v. Ashcroft*, 353 F.3d 228, 238-45 (3d Cir. 2003) (en banc).

has a well-founded fear of future persecution, is a factual conclusion subject to this deferential review. *Gao*, 299 F.3d at 272. We therefore must uphold the IJ's findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

The Immigration Judge (IJ) heard testimony from Garegin and Nadia Ambartsoumian, and from their expert witness, Dr. Suny. He also reviewed the U.S. Department of State Country Reports for Georgia and Ukraine for 1998, and the State Department Asylum Profiles for those countries. He relied heavily on the "objective evidence" of these reports. This reliance was justifiable, as we have held that State Department reports may constitute "substantial evidence" for the purposes of reviewing immigration decisions. *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003); *cf. Lal v. INS*, 255 F.3d 998, 1023 (9th Cir. 2001) (describing State Department country reports as the "most appropriate" and "perhaps best resource" on country conditions).

Based on the record, the IJ determined that the Ambartsoumians had failed to establish a well-founded fear of persecution in either Georgia or the Ukraine. We examine his decision as to each of these countries in turn.

## II. The Ukraine

Nadia Ambartsoumian claims that she was persecuted in the Ukraine because of her Baptist faith. Her father, Nikolai Boyko, was a Baptist preacher who was imprisoned and exiled to Siberia during the Soviet era. Nadia suffered for her father's beliefs: as a child, she was interrogated by the KGB and abused by her classmates, and she lived with her father in Siberia for three years. Nikolai Boyko was in Siberia until 1993.

Garegin and Nadia met in 1988 in Odessa, Ukraine, Nadia's birthplace, while Garegin was on a work assignment. They married in 1989, and returned to Garegin's homeland, but soon moved back to Ukraine to escape ethnic tensions in Georgia. Garegin at first found work in Odessa, but alleges that he was harassed and eventually fired because of his nationality. He claims that the Ukrainian courts refused to help him and that he was unable to find any other permanent employment. Ukraine, too, was suffused with ethnic nationalism, and Garegin claims that the family was repeatedly threatened and insulted. In 1990, Garegin was beaten by Ukrainian nationalists, and decided to return to Georgia so as not to put his family at risk.

He returned to the Ukraine later that year. He claims that he stayed in hiding in his wife's house for two months, apparently because he was in the Ukraine illegally. Eventually, the police raided his house, arrested him, beat him, and told him that this treatment would continue unless he left the Ukraine. He also claims that someone attempted to kidnap the couple's two children, and that Nadia was beaten and threatened because of her non-Ukrainian husband. He once again

5

returned to Georgia in 1992, but quickly came back to the Ukraine to avoid serving in the Georgian army. On Garegin's return, neighbors again attacked and threatened the Ambartsoumians, and Nadia suffered a miscarriage after one such attack.

The Ambartsoumians left the Ukraine for Canada in 1992. While in Canada, they applied for refugee status. They left Canada for the United States in 1996, before Canadian officials had taken final action on their asylum application. They surrendered to immigration authorities in Champlain, NY, and requested asylum.

The above facts and allegations suggest two possible bases for the claim of persecution in the Ukraine, each of which the IJ rejected.

First, Nadia claims that she suffered persecution because of her religious background. The IJ agreed that Nadia's family was persecuted during the Soviet era. But he found that Nadia herself did not suffer the same degree of persecution as her father, and that the post-Communist Ukraine was much more hospitable to Baptists.

There is substantial evidence in the record to support this conclusion. The State Department Asylum Profile states that the Communists repressed Evangelical Christians, but that "[w]ith the overthrow of the Communist regime in 1991, Evangelicals are no longer denied religious freedom and they worship without interference." Ukraine 1997 Asylum Profile 8. The Country Report notes some instances of discrimination against Evangelicals, but nothing that would rise to the level of persecution. Ukraine 1998 Country Report 1589. And Nadia Ambartsoumian admitted during the asylum hearing that her parents and four of her siblings still live in the Ukraine and practice the Baptist faith, and presented no evidence that they are currently persecuted for their beliefs. In fact, though she said that her father had not received permission to buy a house of prayer, she admitted that he currently has a church in Odessa. Reading the record as a whole, we find no compelling reason to reverse the IJ's finding that Nadia Ambartsoumian does not have a well-founded fear of persecution in the Ukraine.[3]

Second, Garegin claims that he and his family suffered persecution because he was not a native Ukrainian. The only evidence for this was the Ambartsoumians' own testimony. The IJ

---

[3]The IJ did not clearly state whether he had found that Nadia had *not* suffered past persecution, or whether he found that she *had* suffered such past persecution, but that the presumption of future persecution was rebutted by evidence of a change in country conditions since the fall of the Soviet Union. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A). Such a failure to make specific findings generally makes review more difficult, but in the instant case we find that either conclusion would be supported by substantial evidence, so we do not inquire further.

again relied on the State Department reports, which indicate that the Ukraine's nationality policy "meet[s] international standards required for the protection of minority groups," Ukraine 1997 Asylum Profile 3, although they also describe "[f]requent harassment of racial minorities," especially dark-skinned Asian and African minorities. Ukraine 1998 Country Report 1590. While this State Department evidence may be equivocal, the IJ was entitled to draw from it the conclusion that Armenians do not face persecution in the Ukraine, *see Kayembe*, 334 F.3d at 236-37, and there is no significant evidence in the record to the contrary.

Moreover, the IJ found that Garegin's troubles in the Ukraine stemmed not from his ethnicity but from his lack of official permission to live and work in that country. This finding, too, is well supported. Both Garegin's and Nadia's own testimony could be read as indicating that Garegin was unable to work, and was harassed by the police, mainly because he had failed to obtain proper legal documents and permissions. Garegin testified that he was fired from his job "[b]ecause I'm not [a] permanent resident of the Ukraine. And plus, I am Armenian." He later testified that he lived in hiding in his wife's house because people had told him that he was in the Ukraine illegally. Nadia gave several reasons for her husband's inability to get a job, including that he speaks no Ukrainian and that he lacked a *propiska*, or residency permit. From this testimony the IJ could

reasonably have concluded that Garegin was not persecuted for his nationality, but rather that he had legal difficulties due to his own failure to obtain the proper permissions. There is no evidence in the record to suggest that Garegin ever sought legal status in the Ukraine, as explained in the margin, or that he would have been prevented from doing so because of his nationality.[4] Garegin's difficulties with his employers and with the police certainly do not amount to ethnic persecution if they

---

[4]The Ambartsoumians introduced into the record evidence of the Ukrainian law of citizenship, apparently to prove that Garegin is currently ineligible for Ukrainian citizenship. This, however, does not prove that Garegin is ineligible for permission to live and work in the Ukraine. In fact, the citizenship law requires that candidates demonstrate "continuous residence on legal grounds on the territory of Ukraine throughout the past five years." This requirement naturally suggests that non-citizens may live legally in the Ukraine.

We also note that, even if Garegin Ambartsoumian did face difficulties in obtaining the proper work and residency permits, this fact alone would not necessarily rise to the level of persecution. *Cf. Ahmed v. Ashcroft*, 341 F.3d 214, 218 (3d Cir. 2003) (holding that a stateless Palestinian in Saudi Arabia did not suffer persecution due to his difficulty in obtaining work and residency permits).

7

were due only to his own failure to follow Ukrainian residency and labor laws. *See Janusiak v. INS*, 947 F.2d 46, 48 (3d Cir. 1991). Thus the evidence as a whole does not compel the conclusion that Garegin suffered persecution in the Ukraine.

### III. Georgia

To prove that they were persecuted in Georgia, the Ambartsoumians presented their own testimony and that of an expert witness. Their testimony indicates that they faced serious difficulties during the (generally short) periods that they spent in Georgia.

Garegin was born in Tbilisi, Georgia, and is a Georgian citizen. He is ethnically Armenian and Ossetian, and is an Armenian Christian, but he has visited Armenia only once, as a child. He claims that, because of his Armenian heritage, he was harassed and beaten while growing up in Georgia, and while serving as a conscript in the Soviet army. After meeting Nadia in the Ukraine, Garegin returned with her to Tbilisi in 1989. With ethnic tensions on the rise in Georgia, the couple claims that they received death threats, and that Nadia was beaten by neighbors because they were not ethnic Georgians. As discussed above, they left for the Ukraine, but Garegin returned to Georgia in 1990 because of difficulties he encountered during his short time in the Ukraine.

When he returned to Georgia, Garegin found a nation divided by the civil war in the region of South Ossetia. As his mother was Ossetian by nationality, his family was in hiding, apparently afraid of anti-Ossetian feeling among Georgians. Fearful for his own safety, Garegin returned to the Ukraine. Again, his stay in the Ukraine did not last long, and Garegin once again returned to Georgia early in 1992. This time, when he arrived at the Tbilisi airport, he was conscripted into the Georgian army to fight in the civil war in the Abkhazia region. He immediately was put on a bus to the front, but managed to escape that night, and fled back to the Ukraine.

The Ambartsoumians also presented the report and testimony of Dr. Ronald Suny, a professor at the University of Chicago and an expert on modern Georgian and Armenian history and politics. Dr. Suny testified that President Zviad Gamsakhurdia's policy of "Georgia for the Georgians" had led to serious problems for Armenians in the early 1990s.[5] He also noted that

---

[5]Gamsakhurdia, an ethnic nationalist, ruled Georgia from 1990 through 1992. He was overthrown in January 1992, and replaced by the more moderate Eduard Shevardnadze. *See* Georgia 1995 Asylum Profile 4. Though it is not in the administrative record, we take judicial notice of the fact that President Shevardnadze stepped down in November 2003, after the final BIA action in this case. He was replaced by Mikhail Saakhasvili, the current president. *See The Comicopera Ends*, The Economist, May 8, 2004, *available at* 2004 WL 62017854.

Armenians became unpopular during Georgia's civil conflict in Abkhazia, because they were perceived as having sided with the Abkhazians. But Dr. Suny acknowledged that conditions in Georgia had improved since the Gamsakhurdia years, although he noted that the Shevardnadze government, *see supra* note 5, was too weak to keep order and protect ethnic minorities. He asserted that the central government had effective control only of Tbilisi, the capital city, and that even within Tbilisi the government had only limited control over its citizens, and even over its police forces. As a result, he represented that there were a number of incidents of unofficial violence against Armenians even since Shevardnadze came to power.

However, Dr. Suny confessed that he had no real familiarity with the Ambartsoumians' situation, but stated that Garegin would have difficulty getting travel documents to return to Georgia, that he would face economic troubles upon his return, and that the government and police would not be zealous in protecting him from other Georgians.

Having heard all this testimony, the IJ determined that the Ambartsoumians had not suffered persecution in Georgia on account of their ethnicity. He relied heavily on the State Department reports, noting that they showed a "historic amity between Armenians and Georgians." While he conceded that there was some discrimination against Armenians during the Gamsakhurdia regime of 1990-1992, he concluded that there was no evidence of discrimination against non-Georgians since then, and that, under the rule of President Shevardnadze, Armenians no longer faced discrimination or persecution.

These conclusions are fully supported by the State Department reports. While the Asylum Profile for Georgia noted that, during the Gamsakhurdia era, "acts against Armenians on a personal basis may have taken place," it concluded that there was no evidence of "actions taken against Armenians *on the basis of their ethnicity*" during that period. Georgia 1995 Asylum Profile 5 (emphasis added). More importantly, it noted that "from 1993 we have seen no evidence of governmental discrimination against the non-Georgian population." *Id*. at 4.

In evaluating the evidence offered by the Ambartsoumians and Dr. Suny, the IJ found that it did not establish that the Ambartsoumians experienced past persecution in Georgia. He did not explicitly make an adverse credibility finding, though he concluded that some aspects of the Ambartsoumians' testimony were "inaccurate." Importantly, he noted that Dr. Suny had agreed that relations between Georgians and Armenians had historically been amicable, and that the Shevardnadze government had largely restored those relations after the Gamsakhurdia troubles. The IJ also found that Suny's concerns about the dangers facing

9

Armenians were not supported by "the weight of objective evidence." He determined that, even during the Gamsakhurdia years, there was little or no government-sponsored persecution of Armenians, and that the Ambartsoumians "avoided the excesses of the Gamsakhurdia regime by relocating to Ukraine."

As noted above, the IJ's reliance on "objective evidence" in the form of State Department reports was justifiable under our decision in *Kayembe*. Upon reviewing the testimony and affidavits presented by the Ambartsoumians, and the State Department reports considered by the IJ, we are unable to conclude that the record would compel any reasonable adjudicator to reject the IJ's findings. Even if we accept, as the IJ apparently did, that the Ambartsoumians encountered difficult conditions in Georgia, that would not necessarily support a finding of past persecution. Certainly Georgia was, and continues to be, involved in a number of civil conflicts. In fact, the IJ specifically found that the Ambartsoumians' principal reason for leaving Georgia was the civil war. But we have held that the standard for persecution is high, and that "'generally harsh conditions shared by many other persons' do not amount to persecution." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985)). Ambartsoumian alleges that, on his return to Georgia in 1992, he was pressed into military service in Georgia's civil war against the region of Abkhazia. But conscription by a sovereign nation cannot constitute persecution under 8 U.S.C. § 1101(a)(42). *Lukwago v. Ashcroft*, 329 F.3d 157, 168-69 (3d Cir. 2003). Thus the facts that life in Georgia was difficult due to a civil war, and that Garegin Ambartsoumian was conscripted to fight in that war, do not in themselves establish past persecution.

We do not deny that the Ambartsoumians', and Dr. Suny's, descriptions of life in Georgia are troubling. But we do not believe that these allegations rise to the level of persecution required by § 1101(a)(42) and by *Fatin*. Thus, the record does not compel us to set aside the IJ's finding that the Ambartsoumians did not suffer persecution in Georgia, or his determination that they had not established a well-founded fear of future persecution there.

IV. The State of the Record

The record in this case consists of the Ambartsoumians' testimony about events predating 1992, and of State Department reports from 1995 through 1998. Concerned about the long delay between this record and our review of the case, we requested supplemental briefing on the issues raised by this Court in *Berishaj v. Ashcroft*, 378 F.3d 314, 328-31 (3d Cir. 2004), and reiterated in *Gambashidze v. Ashcroft*, 381 F.3d 187, 193-94 (3d Cir. 2004). The government's submission in response to this request informed the Court of the new, and

10

salutary, screening policy described above (and set forth fully in the Appendix).

The Department of Justice asserts that it has followed its screening policy in this case, but has determined that conditions have not changed significantly enough to make the record here obsolete and require a remand. Mindful of our obligation to base our review on the contents of the administrative record, *see Berishaj*, 378 F.3d at 330, we are unwilling to take judicial notice of the most recent State Department reports on Georgia and the Ukraine, which are easily available on the Internet, *see* http://www.state.gov/g/drl/rls/hrrpt/2003/ . Instead, we simply note that neither of the parties have provided any evidence or argument that would counsel a remand to open the record in this case. At oral argument, counsel for petitioners specifically disclaimed the argument that the administrative record in this case was insufficient because of staleness; instead, he argued that the evidence in the record compels reversal. And petitioners have not filed a motion to reopen the record before the BIA, pursuant to 8 C.F.R. § 1003.2(c). The government submits that no material changes have occurred in Georgia or the Ukraine.

In short, no serious suggestion has been made that conditions in the Ukraine have changed, in any respect material to asylum, since the BIA's decision; while Georgia has a new president, *see supra* note 5, neither party has suggested that the new regime is any worse for ethnic minorities than was the Shevardnadze government. Both parties rely on the record before the IJ and the BIA, and we are therefore satisfied that our concerns in *Berishaj* and *Gambashidze* are inapplicable here.

## V.  Conclusion

On reviewing all the evidence in the record, we are unable to conclude that the evidence as a whole would compel any reasonable adjudicator to find that the Ambartsoumians suffered persecution in either Georgia or the Ukraine, or that they have a well-founded fear of future persecution or torture in either of those countries. Therefore, we will deny the petition for review.

## Appendix

To clarify the new policy of the Office of Immigration Litigation (OIL), we set forth, in full (including footnotes), Part II of the government's supplemental memorandum in the instant case:

> After receiving a copy of the Court's decision in *Berishaj*, the Office of the Attorney General and the Civil Division immediately started to consider how best to address the Court's concerns. The Deputy Assistant Attorney General for OIL consulted with the Executive Office of Immigration Review (EOIR) (which includes the

11

Board of Immigration Appeals (BIA) and the Immigration Judges (IJ)) and the Department of Homeland Security (DHS) (which litigates cases in front of the BIA and IJs)[6] to determine the reasons for the stale records and to explore possible solutions. Based on these meetings and OIL's own analysis of the issue, he proposed to the Assistant Attorney General of the Civil Division that, as a matter of "prosecutorial discretion," the Government should screen out and seek to remand cases whose records are out-of-date and not appropriate for judicial review.[7] Although such

remands would add delay to the adjudication of some aliens' claims, and although it is possible that a remanded case would become stale again after the record is supplemented, this proposal appeared to be a sound method for improving the quality of records in appropriate cases. The Assistant Attorney General agreed, and so did the Office of the Attorney General.

Accordingly, at the direction of the Deputy Assistant Attorney General for OIL, the Director of OIL has informed all attorneys under his supervision that, when a case is assigned to them, they should consider whether the age and quality of the record counsels in favor of a remand. If a record is old and deficient, the attorney should promptly bring it to the attention of the Director of

---

[6]After its creation, DHS assumed the responsibilities of the former Immigration and Naturalization Service, including the prosecution of cases before the BIA and IJs. The Civil Division, through OIL, continues to defend the BIA's decisions in the federal courts.

[7]The decision to seek a remand in a particular case would, of course, be discretionary. The law does not require the Government to screen out and seek remands in cases in which country conditions have gotten worse, strengthening an alien's asylum claim (or, for that matter, cases in which

conditions have improved, weakening the alien's claim). Rather, the prescribed regulatory mechanism for responding to stale records is the motion to reopen. *See* 8 C.F.R. § 1003.2(c). If conditions in a country worsen, the alien has the burden of filing the motion to reopen. *Id.*

OIL, who, in consultation with the OIL's client agencies (EOIR and DHS), will exercise his discretion on whether to seek a remand in the case.

The Director of OIL also notified all OIL attorneys of the factors that they should consider in assessing whether a record is suitable for judicial review. Among these factors are: (1) whether there have been pertinent, intervening events in the country of removal; and (2) whether the issues on review are "time sensitive" in that changes in conditions over time may affect the resolution of the issues. In addition, because OIL's screening of cases should not create a windfall for aliens who have failed to meet their burdens of proof or to pursue the procedural opportunities available to them, OIL attorneys should determine in each case whether the alien bears the burden of proof, whether the alien has made efforts to perfect and preserve the record on his claims through timely motions to the agency, and whether

the alien was improperly denied the opportunity to perfect and preserve the record on his claims.[8] OIL attorneys will consider these factors in all subsequent cases in light of *Berishaj*.

Moreover, EOIR has also taken steps to respond to the Court's concerns. Even before *Berishaj*, the BIA remanded cases from countries where conditions were fluid, thus enabling the parties to supplement the record. After meeting with DHS and the Deputy Assistant Attorney General for OIL, EOIR agreed to continue to consider additional remands. Additionally, EOIR is currently contemplating other proposals, including,

---

[8]These factors reflect the fact that an old record is not necessarily a deficient record. For example, country conditions may not have changed despite the passage of time (conversely, a record could be deficient even if not much time has passed). Moreover, even if country conditions have changed, a remand might not be appropriate, if, say, none of the issues in the case is time sensitive or if the other factors in the analysis counsel against remand.

if an appropriate case arises, having the BIA issue a published decision remanding a case with a stale record. The Members of the BIA have already discussed *en banc* this Court's decision, and are continuing to do so. The Respondent will inform the Court of any proposals that are adopted.