

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-2008

# Vejseli-Ismaili v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2367

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Vejseli-Ismaili v. Atty Gen USA" (2008). *2008 Decisions.* Paper 331.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/331

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEAL
FOR THE THIRD CIRCUIT

No. 07-2367

BLERTA VEJSELI-ISMAILI;
ABDULA ISMAILI,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review from an Order of the
Board of Immigration Appeals
(BIA-1: A98-228-476
BIA-1: A98-228-477)
Immigration Judge:  Hon. Eugene Pugliese

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 21, 2008

BEFORE: SMITH and  COWEN , Circuit Judges
and THOMPSON*, District Judge

(Filed:  October 24, 2008)

*Honorable Anne E. Thompson, Senior United States District Judge for the District of
New Jersey, sitting by designation.

OPINION

COWEN, <u>Circuit Judge</u>.

Petitioners, Blerta Vejseli-Ismaili ("Blerta") and her husband, Abdula Ismaili ("Abdula") (collectively "Petitioners"), seek review of the Board of Immigration Appeals' ("BIA") denial of their application for asylum and their order of removal. Because substantial evidence supports the conclusion that Petitioners were not persecuted on account of their home country's unwillingness to protect them from private harassment, their petition will be denied.

## I.  BACKGROUND

Petitioners are citizens of the Republic of Macedonia, a country located on Europe's Balkan peninsula.  Blerta and Abdula were separately admitted to the United States as non-immigrant visitors and were married soon thereafter.  On February 23, 2004, Blerta filed an asylum application with the Department of Homeland Security ("DHS"), and included Abdula in the application.  DHS served Blerta and Abdula with Notices to Appear, which charged them with removability for remaining in the United States longer than the period authorized by immigration authorities.

Petitioners subsequently appeared before an Immigration Judge ("IJ").  At the hearing, Petitioners renewed their request for asylum, requested withholding of removal, and sought protection under the Convention Against Torture ("CAT"); but admitted that

2

they had overstayed their visitor visas and conceded removability as charged in the Notices to Appear.

Blerta's testimony, which was corroborated by Abdula, described her life in the nine years since she met, and began a relationship with, Abdula in 1994. Petitioners are both ethnic Albanian Muslims; however Adbula's family follows more fundamentalist traditions, including arranged marriages, whereas Blerta was raised in a family with moderate views. Blerta received a college education and worked for nine years as an airlines stewardess.

Blerta testified that in March of 1998, after she and Abdula had been dating for several years, she began receiving phone calls from unidentified women. Blerta believed that the callers were members of Abdula's family. One caller harassed Blerta by calling her derogatory names, and told her that she was without morals or religion, and that she would never marry Abdula. Another caller, who was later identified as Abdula's mother, told her to stay at home and not talk to men if she wanted to marry Abdula because he would only marry the person chosen by his family.

Blerta also described an incident that occurred in June, 2001, while she was attending a friend's wedding. At the ceremony, three veiled women, who were later identified as Abdula's cousins, came up to Blerta with scarves and tried to cover her head and face. Their attempts caused a scene, and many guests at the wedding stopped to observe the commotion. Blerta was so humiliated that she left the wedding in tears.

3

A third incident occurred in a restaurant in October, 2002. Blerta was dining with friends when a group of men, who Blerta believed to be fundamentalists, entered the restaurant and began to yell that she was a traitor to her religion and call her derogatory names. Blerta, again feeling humiliated, left the restaurant. Blerta considered reporting this incident to the police, but did not because she was afraid that something might happen to her if she did.

Blerta told Abdula about the incident at the restaurant. She said that she was tired of being humiliated and that they either had to get married or stop seeing each other. The couple decided to get married. Abdula then told his family that he was going to marry Blerta, and that he would not marry anyone selected by his family.

Several months later, in August, 2003, Blerta was driving home when a car containing four men crossed in front of her, forcing her to come to a stop. One of the men got out and dragged Blerta out of her car by her hair. According to Blerta, the men were shouting obscenities, saying that she would never marry Abdula and threatening to kill her if she did not leave him alone. One man pulled down his pants and made sexual gestures. After several minutes of this, the men got back in their car, threatened to kill Blerta if she told anyone about the incident, and drove away.

Blerta did not report the incident to the police because she did not think that the police would want to get involved in Albanian family matters, and she was intimidated by the men's threats. Instead, Blerta decided to come to the United States, arriving

approximately one month later in September, 2003. Blerta testified that she feared that she would be raped or killed if she stayed in Macedonia or if she were forced to return.

In addition to Petitioners' testimony, the IJ admitted into evidence several exhibits, including the asylum application, supporting statements, and background documents. The IJ also heard from a witness who testified as an expert regarding cultural issues in Macedonia.

In an oral decision, the IJ denied Petitioners asylum application and other requests for relief, and ordered that Petitioners be removed. The IJ discounted Petitioners' testimony, finding it to be vague and generally not credible. On the applications for relief, the IJ found that Petitioners had not sustained their burden of proof. Specifically, the IJ found that Petitioners had not attempted to live peacefully in another area of their own country, nor had Blerta ever made any effort to report any of the incidents to the police. Macedonia, the IJ noted, was not a country with significant human rights abuses, an incompetent judiciary, or an incompetent or corrupt police department; nor was there anything in the record showing that the authorities would have been unable or unwilling to protect Petitioners. The IJ explained that the testimony merely described how Blerta was afraid to report the incidents to the police; not that the police refused to accept the reports or that the police were incompetent or unwilling to help. Given these failures, the IJ concluded that asylum, as well as Petitioners' requests for withholding of removal and relief under the CAT, were unmerited.

The BIA affirmed the IJ's decision denying asylum and ordering removal. Because the IJ's adverse credibility finding did not cite to any significant inconsistences or discrepancies, the BIA did not affirm the IJ's adverse credibility finding. However, even taking Petitioners as credible, the BIA agreed with the IJ's findings that Petitioners had not established that they suffered past persecution or that they have a well-founded fear of returning to Macedonia. The BIA found that the incidents described by Petitioners did not rise to the level of persecution, nor did Petitioners establish that the government of Macedonia was unwilling or unable to protect them. Because the BIA found that Petitioners had failed to establish their eligibility for asylum, or any other form of relief, the BIA dismissed Petitioner's appeal.

We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1).

## II. ANALYSIS

### A. Standard of Review

Because the BIA partially adopted the IJ's decision, but supplied additional reasoning, this Court reviews the decisions of both the IJ and the BIA. See Voci v. Gonzales, 409 F.3d 607, 612 (3d Cir. 2005). We review the BIA's legal conclusions de novo, "subject to the principles of deference articulated in Chevron v. Natural Resources Defense Counsel, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)." Wong v. Att'y Gen. of the U.S., 539 F.3d 225, 2008 U.S. App. LEXIS 17720, at * 10 (3d Cir.

6

2008). The BIA, which is "bound by the IJ's factual determinations," reviews the findings to determine whether they are clearly erroneous. Id. We, in turn, review the BIA's factual findings under the deferential substantial evidence standard, and "defer to the BIA's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (citations omitted). Accordingly, we will uphold the BIA's findings unless the evidence in the record compels a contrary conclusion. Id.

### B. Past Persecution

Petitioners argue that the BIA erred in ordering their removal because the evidence in the record demonstrates the ostracism and unequal treatment of the Albanian ethnic minority in Macedonia, thereby making Petitioners eligible for asylum based on the past persecution that they suffered on account of their ethnicity and social group. We disagree.

An alien may be granted asylum as a refugee if the alien establishes that she is unwilling or unable to return to her home country, or unwilling or unable to avail herself of the protection of that country, "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see also 8 U.S.C. § 1158. Persecution includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom"; but it does not "encompass all

7

treatment our society regards as unfair, unjust or even unlawful or unconstitutional."

Kibinda v. Att'y Gen. of the U.S., 477 F.3d 113, 119 (3d Cir. 2007) (citing Fatin v. I.N.S.,

12 F.3d 1233, 1240 (3d Cir. 1993)).

An alien establishes that she has been subjected to past persecution by showing at

least one incident that rises to the level of persecution, which was committed on account

of one of the statutorily protected grounds, and was carried out by the government or

forces that the government was unable or unwilling to control.  Kibinda, 477 F.3d at 119;

Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).  An alien who establishes that she has

been a victim of past persecution is entitled to a rebuttable regulatory presumption that

her fear of similar, future persecution is well-founded.  See 8 C.F.R. § 208.13(b)(1).

Petitioners have failed to establish that the government was unable or unwilling to

protect them from the harm that they suffered.  The record reflects, specifically Blerta's

testimony, that she never reported any of these incidents to the authorities.  The evidence

regarding the state of the Macedonian government supports the conclusion that legal

recourse was available.

In addition, nothing in the record compels the conclusion that the incidents Blerta

experienced in Macedonia constituted persecution.  The phone calls and threats from

Abdula's family can at best be described as harassment.  Although traumatizing to Blerta,

these incidents do not rise to the level of the extreme conduct that constitutes persecution.

See Chavarria v. Gonzales, 446 F.3d 508, 518 (3d Cir. 2006) (explaining that threats

constitute persecution only in "a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm . . . [or] are highly imminent and menacing in nature").

### C. Additional Claims for Relief

Because Petitioners have failed to establish past persecution, their claims for asylum on the basis of a well-founded fear of future persecution, withholding of removal and relief under the CAT must similarly fail. Petitioners merely rely on the regulatory presumption to establish a fear of future persecution; they have not presented any independent arguments to support a claim of fear of future persecution. Nothing in the record compels us to conclude that Petitioners would be persecuted if returned to Macedonia. Petitioners' failure to meet the lower standard for a grant of asylum supports the denial of their claim for withholding of removal. See Ambartsoumian v. Ashcroft, 388 F.3d 85, 88-89 (3d Cir. 2004). Finally, Blerta never alleged that she was tortured and, therefore, no relief is available under the CAT.

## III. CONCLUSION

For the reasons set forth above, the petition for review is denied.

9