OPINION OF THE COURT
ALDISERT, Circuit Judge.
The lead petitioner Shermamat Abdullo-zoda, a native and citizen of Uzbekistan, of Iranian descent, seeks a review for himself and members of his family of a decision of the Board of Immigration appeals (“BIA” or “Board”) denying asylum, withholding of removal, and protection under the Convention Against Torture (“CAT”) on the ground that the petitioners did not meet their burden of showing past harm rising to the level of persecution or a well-founded fear of future persecution. They also contend that the BIA abused its discretion by declining to equitably toll the filing deadline for petitioners’ motion to reopen based on a Human Rights Watch letter. Finally, petitioners argue that indiscernible testimony in the record of the IJ’s proceedings prevented the Board from conducting a meaningful review. We have jurisdiction under 8 U.S.C. § 1252. We will deny the petition.
I.
An alien who is in violation of the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., is subject to removal from the United States. However, the Attorney General in the exercise of discretion may grant relief from removal in the form of asylum to an alien who proves that he or she is a refugee. An alien is a refugee if he or she is unable or unwilling to return to his or her country for the so-called statutory grounds “of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or *758 political opinion[.]” 8 U.S.C. § 1101(a)(42)(A). The burden of proof is on the alien to establish that he or she is a refugee. 8 U.S.C. § 1158(b)(l)(B)(i).
An application for asylum in removal proceedings is also considered to be a request for withholding of removal. To succeed in attaining withholding of removal, the alien in the proceedings bears the burden of establishing that he or she would “more likely than not” suffer persecution in a country of removal on account of one of the enumerated statutory grounds. Wu v. Ashcroft, 393 F.3d 418, 423 (3d Cir.2005). This requires an alien to show a “clear probability” of persecution. INS v. Stevic, 467 U.S. 407, 429, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). Withholding of removal is also available on separate grounds under the CAT for any person to a country in which there are substantial grounds for believing that the person would be in danger of being subjected to torture. The burden is on the alien “to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.” 8 C.F.R. § 1208.16(c)(2). Protection under the CAT differs from asylum or withholding of removal because it does not require a showing that the mistreatment was or would be on account of any particular characteristic of the victim such as race, religion, nationality, membership in a particular social group, or political opinion.
We now address the facts with these legal precepts in mind.
II.
Abdullozoda testified at the hearing before the Immigration Judge (“IJ” or “judge”) that he was called names in elementary school and a student once burned him. While serving his military duty, he was called “black face” and beaten once because of his Iranian ancestry, and was dishonorably discharged after six months of service. In 1985, Abdullozoda’s college application was denied. He did not pass the entrance examination, and he believes that he failed due to his nationality. Ab-dullozoda was admitted to college in 1987. He began working for the Ministry of Finance in 1996. In the course of auditing investment projects, he learned that his supervisor was accepting bribes for her approval of projects. He complained, but other Ministry workers rejected his concerns and, according to the Petitioner, insulted his Iranian ancestry.
Abdullozoda testified that in 2000 he returned home after a visit to the United States and two men attacked him. Abdul-lozoda also testified that they threatened him and said, “Stop putting your nose into other people’s business — you’re an Arab!” He testified that the men stabbed him in the hand, that he was rushed to the hospital for surgery, and that his wife went to the police to report the incident, but they failed to find or arrest the perpetrators. Abdullozoda believes that the police did not find them because of his nationality. A letter from the police states that the investigation was closed due to a lack of witnesses. In December 2002, Abdullozo-da received a summons to appear in the District Department of Internal Affairs where he was ultimately questioned about a Muslim extremist organization, held overnight, and then released. Abdullozoda testified that in the Fall of 2003 his children had problems in school, culminating with his son Sardor coming home with bruises after fighting with several children who accused his family of being terrorists.
In February 2004, a person followed Ab-dullozoda after work and attacked him on the street. The person called him an Arab and broke his nose. Petitioner filed a police complaint after he went to the hospital and he testified that the police took no further action. In May 2004, he and his *759 family returned home to find that their home was burglarized. The intruders left a sign stating, “Arab, get out of Uzbekistan! You are a traitor!” The sign warned Abdullozoda to “keep [his] mouth shut!” The police responded to his call, but a day later informed Abdullozoda in writing that they would not investigate the case due to a lack of witnesses and lack of harm to anyone. Abdullozoda stated that when the police came to his home, they wanted to know whether he might be a terrorist. In June 2004, he came to the United States and applied for asylum. His family had already arrived for an academic competition for the children. Abdullozoda was subsequently fired from his job for leaving it. In May 2005, Abdullozoda’s brother was allegedly murdered. Abdullozoda testified that the perpetrators were never found. We now turn to the evaluation of his testimony by the I J.
III.
The IJ found Abdullozoda and his wife credible, but concluded that the discrimination Abdullozoda and his wife suffered in their schooling did not constitute past persecution, and in any event, certain events to which he testified were too remote in time to support a fear of future persecution. The IJ noted that the incident involving their son at school was an isolated event, and further found that Abdullozo-da’s brief detention in 2002 did not constitute an act of persecution, as police made clear that they were simply questioning his involvement in any terrorist organization, and they did not harm him.
The IJ recognized that whistle blowers who expose government corruption might be able to establish asylum eligibility and discussed several cases where aliens publicized their concerns and were then deprived of employment, liberty and safety. The judge stated that Abdullozoda only complained within his workplace, and when he was threatened to stop complaining, he did so, and there was no evidence that Abdullozoda exposed the corruption, nor that he was fired or demoted. The judge also noted that Abdullozoda could not connect his physical assaults to his workplace or to the government. The attacks were not only committed by strangers, but too remote in time to be connected with later events. The IJ found it possible that the crimes were random acts of nationalist violence, and determined that Abdullozoda did not adequately explain why his coworkers would have turned into “thugs” to threaten him instead of simply having him discharged. The judge also determined that there was no evidence of a pattern or practice of persecution against Iranians, and concluded that Abdullozoda had not proven that he was persecuted by the authorities on this basis.
The IJ also noted that Abdullozoda did not attempt to move or look for a new job. Rather, he retained his position in public employment, took vacations paid in part by his employers, and did not seek asylum when he first came to the United States. The judge noted that there was no evidence showing that the government would consider Abdullozoda a minority or encourage the harm that took place. To the contrary, the government issued passports recognizing the family as Uzbekistani nationals, and did not appear to believe that he was connected with a banned political party or part of any Islamist movement. Although ultimately the crimes against Ab-dullozoda were not solved due to lack of evidence, the police both responded and opened files on the crimes. Significantly, the judge noted that Abdullozoda did not tell the police whom he suspected was responsible for the crimes, and the police investigated the incidents that occurred and provided reasonable explanations for closing the cases. Finally, the IJ stated that there was not enough information to connect Abdullozoda to the murder of his *760 brother in 2005, more than a year after Abdullozoda left Uzbekistan. An unsuccessful appeal to the BIA followed.
IV.
Abdullozoda contends in his petition for review that documentation from the Human Rights Watch constituted new evidence establishing a change in Uzbekistan policy. He states that Uzbekistan took a confrontational position with the United States and started to persecute formerly successful pro-Western politicians like himself. The Human Rights Watch letter describes growing anti-Western sentiment over the past four years, particularly since 2005, and the Uzbekistan government’s attempts to locate people with ties to Western governments. The letter from the Human Rights Watch opines that if Abdul-lozoda’s story is true, he would face a high risk of persecution on account of his reformist views.
V.
In the appeal to the BIA, the petitioners were unsuccessful on the merits. They then filed a motion for reconsideration, reopening, and reissuance of the BIA’s decision, alleging ineffective assistance of counsel because Attorney Sirota failed to notify them of the Board’s dismissal of appeal and failed to contact Human Rights Watch in the initial litigation. The Human Rights Watch letter was submitted with the motion. The Board denied the motion for reconsideration because it was untimely and did not allege any error of law or fact in its prior decision. The motion for reissuance was treated as a motion to reopen and was granted with respect to the ineffective assistance claim, for failure to advise petitioners of the Board’s decision. The Board vacated and reissued its original decision. The Board did not equitably toll the deadline with respect to the Human Rights Watch letter because, according to the Board, it did not contain new information, as demonstrated by Abdullo-zoda’s previous argument that counsel should have offered the information at the hearing before the IJ. The Board further found that petitioners failed to comply with the requirements of Matter of Lozada by not raising the issue in their bar complaint and failing to show resultant prejudice. 19 I. & N. Dec. 637 (BIA 1988); See Lu v. Ashcroft, 259 F.3d 127, 129 (3d Cir.2001) (“We conclude that the Lozada requirements are a reasonable exercise of the Boai'd’s discretion!)]”).
VI.
We review an agency’s findings regarding asylum for substantial evidence. See 8 U.S.C. § 1252(b)(4)(B) (“administrative findings of facts are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary”). Because the Board adopted the findings of the IJ, we have jurisdiction to review both decisions. Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir.2004). Petitioners failed to establish past persecution and therefore are not entitled to a presumption that they harbored a well-founded fear of future persecution in Uzbekistan. To show a well-founded fear of persecution an alien must demonstrate that his or her fear is both genuine and objectively reasonable. We conclude that substantial evidence supports the IJ and BIA’s conclusion that petitioners failed to show eligibility for asylum based either on a pattern or practice of persecution or on an individualized showing of a well-founded fear. Accordingly, it follows that petitioners did not meet the higher burden of proof for withholding of removal. See Reynoso-Lopez v. Ashcroft, 369 F.3d 275, 278 (3d Cir.2004).
When an alien claims that a deficient record prevents the Board from conducting meaningful review or his or her appeal, the alien must show how the alleged defi *761 ciencies in the record were prejudicial. Bhiski v. Ashcroft, 373 F.3d 363, 370 (3d Cir.2004). Here petitioners do not identify a single incident of indiscernible testimony that might have established their eligibility for asylum, withholding of removal or the CAT protection. They have therefore failed to show that the deficiencies in the record caused them prejudice.
Motions to reopen are “disfavored” because of the threat they pose to finality. INS v. Doherty, 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992). “This is especially true in a deportation proceeding, where, as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States.” Id. We consider questions of law de novo, but we otherwise review an order denying a motion to reopen under a highly deferential abuse of discretion standard. See Fadiga v. Att’y Gen., 488 F.3d 142, 154 (3d Cir.2007); Guo v. Ashcroft, 386 F.3d 556, 562 (3d Cir.2004). The BIA’s discretionary decision will not be disturbed unless it is arbitrary, irrational or contrary to law. See Guo, 386 F.3d at 562. In the interest of finality, a motion to reopen generally “shall be filed within 90 days of the date of entry of a final administrative order of removal.” 8 U.S.C. § 1229a(e)(7)(C)(i). In this case, Abdullozoda filed his motion to reopen five months after the Board’s decision and over two months after the 90-day deadline. Under some circumstances, equitable tolling is available for a motion to reopen. See Borges v. Gonzales, 402 F.3d 398, 406 (3d Cir.2005). Petitioners alleged ineffective assistance of counsel, which can serve as a basis for equitable tolling, if substantiated, and if accompanied by a showing of due diligence. See Mahmood v. Gonzales, 427 F.3d 248, 252 (3d Cir.2005). However, to rely on an ineffective assistance of counsel claim to toll a time limit, the BIA requires an alien to comply with the procedural requirements of Matter of Lozada, a requirement we have held to be reasonable. Lu, 259 F.3d at 129. Petitioners did not comply with the Lozada requirements and did not show that Attorney Sirota’s failure to contact Human Rights Watch amounted to ineffective assistance of counsel, causing prejudice. We agree with the Board’s conclusion that petitioners failed to show “a ‘reasonable likelihood’ that the result would have been different” if the Human Rights Watch letter had “been offered at the hearing.” (BIA Decision, June 26, 2008 (citing Fadiga, 488 F.3d at 159).) Furthermore, petitioners did not exercise the due diligence necessary to win equitable tolling. See Borges, 402 F.3d at 407. Petitioners have not shown that the BIA’s decision was arbitrary, irrational or contrary to law.
We have considered all the contentions raised by the parties and conclude that no further discussion is necessary. The petition for review will be denied.