

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2009

# Ndayshimiye v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-3201

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Ndayshimiye v. Atty Gen USA" (2009). *2009 Decisions*. Paper 1795.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1795

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3201
_____

JEAN BOSCO NDAYSHIMIYE;
SPECIOSE MUREKATETE,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent
_____

On Review of a Decision of the Board of Immigration Appeals
(BIA No. A97-529-530 and A97-529-529)
Immigration Judge: Mirlande Tadal
_____

Argued November 17, 2008
Before: SCIRICA, Chief Judge, FUENTES, and HARDIMAN,
Circuit Judges

(Opinion Filed: February 24, 2009)

-1-

Kelly A. Carrero (Argued)
Matthew V. Barter
William J. Hine
Jones Day
222 East 41st Street
New York, NY 10017-0000

Attorneys for Petitioners

Julie M. Iversen (Argued)
Allen W. Hausman
Margaret J. Perry
Jeffrey S. Bucholt
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Attorneys for Respondent

Richard D. Steel
Deborah E. Anker
Harvard Immigration and Refugee Clinical Program
1563 Massachusetts Avenue
Cambridge, MA 02138

Amicus Curiae for the Court

OPINION OF THE COURT

FUENTES, Circuit Judge:

Rwandan citizens Jean Bosco Ndayshimiye and his wife Speciose Murekatete sought asylum in the United States in 2006, alleging that they had suffered persecution at the hands of Ndayshimiye's aunt in Rwanda. They now petition for review of the Board of Immigration Appeals' ("BIA") decision rejecting their application for asylum. Petitioners asserted before the BIA that although their mistreatment was precipitated by a 2004 land dispute with Ndayshimiye's aunt, it was also caused by their status as recent immigrants to Rwanda from Burundi, where they had been born after their Rwandan parents fled there in the 1960s. Based on the fact that Ndayshimiye had a relatively peaceful relationship with his aunt for the eight years following Petitioners' return to Rwanda in 1996, the BIA concluded that any persecution occurring after 2004 was motivated solely by the land dispute. Although the BIA's interpretation of the statutory standard for analyzing possible "mixed motives" persecution was partially in error, its rationale that petitioners' Burundian background was at most incidental to other reasons for their persecution does support the Board's ultimate conclusion even under the corrected standard. Therefore, we will deny the petition.

## I.

Petitioners Ndayshimiye and Murekatete were born in Burundi, but are Rwandan citizens since their parents were originally Rwandan but fled from that country in the 1960s. They

are of Tutsi ethnicity. In 1996 they both returned to Rwanda along with several hundred thousand other Rwandan refugees who are known as "old case-load" refugees. These former refugees have different social status in Rwandan society depending on the country from which they have repatriated; those from Burundi apparently have very little influence or power and are resented by Rwandans who did not flee.

When Petitioners returned to Rwanda, Ndayshimiye made contact with some relatives who had remained in the country. One of them, his uncle Frederick Karuranga, deeded Ndayshimiye a parcel of land on which to build a home. Ndayshimiye put off construction for financial reasons.

In 2004, two years after Karuranga's death, Petitioners began building a home on the lot. Ndayshimiye's aunt, Primitive Musabwasoni, contested their right to the land, telling Ndayshimiye that he was not a member of the family and that he should go back to Burundi. She also attempted to sell the land to someone else for a significant sum of money. Musabwasoni is well-connected in Rwandan society; among her children are Reverien Claude Rugwizangoga ("Reverien"), a major in the Rwandan national police, John Fayinzoga, the chairman of a commission to demobilize the Rwandan army, and Gilbert Twgirunukiza, an executive in the president's office.

Ndayshimiye filed a complaint concerning the land dispute before a community tribunal, which resolved the matter in his favor in November 2004. Around March 2005, Ndayshimiye began receiving anonymous phone calls several times a week on his work phone in which he was told that he was not Rwandan, was stealing land that did not belong to him, and must return to Burundi.

-4-

Ndayshimiye recognized the voice on some of the phone calls as his aunt's son, Reverien. In one call, the speaker said that if Ndayshimiye's family did not return to Burundi on their own they would be thrown into the Akagera River to return there. Petitioners construe this threat as a reference to the 1994 Rwandan genocide, during which massacred Tutsis were dumped into the Akagera. These phone calls lasted through June 2006. Murekatete also received calls in June 2006, at Petitioners' home, on which she identified Reverien's voice.

Frightened of the possible consequences, Ndayshimiye did not resume construction on the land despite his legal victory. Nor did he seek protection from the authorities, believing that the influence of Musabwasoni and her sons in the government, along with his own low social status, would render that attempt futile. Ndayshimiye and Murekatete remained in a rental property about thirty minutes away from the disputed land.

Despite their inaction regarding the land, on three occasions in May and June 2006 Reverien came to Petitioners' residence at night in his police uniform, armed and accompanied by other armed police officers. Each time, he identified himself as a member of the police and asked for Ndayshimiye. Upon being told that Ndayshimiye was working, Reverien told Murekatete that her husband was Burundian, not Rwandan, and must go back. On the third visit, Reverien said, "If you don't want to go back when it's good, you're going back badly." (A.R. 229.)

Because of these threats, Petitioners sought to leave Rwanda. They did not want to return to Burundi because of ongoing ethnic tensions there and the possibility of civil conflict. Ndayshimiye, who worked as a driver at the United States embassy,

-5-

was invited by a U.S. citizen to visit his home in Virginia and obtained tourist visas for himself, his wife, and their children to go to the United States. During Reverien's second visit to Petitioners' house, he searched Murekatete's purse and found her American visa. At that point Reverien asked Murekatete if she had told Ndayshimiye yet that he must return to Burundi.

Petitioners entered the United States on September 11, 2006. Upon arrival, they were informed that their visas had been cancelled in June 2006, apparently because a co-worker of Ndayshimiye's at the U.S. embassy in Rwanda had told the State Department that Petitioners were selling off their belongings and were not planning to return to Rwanda when their visas expired. That co-worker reportedly also worked with the Rwandan national police. Ndayshimiye and Murekatete believed Musabwasoni and Reverien had orchestrated the cancellation of their visas through the co-worker. They were afraid to return to Rwanda because of the possibility of further persecution and thus sought refuge in the United States. They applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

To be granted asylum, Petitioners were required to show that they were "unable or unwilling" to return to Rwanda "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). After a merits hearing, an Immigration Judge ("IJ") denied Petitioners' applications on January 4, 2007. That ruling rested primarily on the IJ's finding that Ndayshimiye and Murekatete had failed to show that Musabwasoni's past persecution was motivated by their imputed nationality or social group. The IJ reviewed Petitioners'

-6-

case under the statutory "mixed-motives" standard of the Immigration and Nationality Act ("INA") § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i). That provision was enacted in 2005 as part of the REAL ID Act to permit asylum for an applicant who could establish that, even if a persecutor had more than one motive, "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." Id. The IJ concluded that nationality and/or social group had played no part in the threats against Petitioners. She found that the land conflict alone, a simple "family dispute," instigated the friction between Ndayshimiye and his aunt. (A.R. 68.) The IJ's opinion included no conclusion as to Ndayshimiye's or Murekatete's credibility.

Petitioners appealed this decision to the BIA on January 18, 2007. The BIA affirmed in a published precedential opinion. In re J– B– N– & S– M–, 24 I. & N. Dec. 208 (B.I.A. 2007). In interpreting § 208, the BIA reasoned that, though "central" may be defined as "having dominant power, influence, or control," Congress's use of the phrase "one central reason" rather than "the central reason" indicated that under § 208 a protected ground need not be the single dominant reason for an applicant's persecution. Id. at 212-13. Next, the BIA turned to the conference report for the REAL ID Act, which states that a protected ground is not a "central" reason if it is simply "incidental or tangential to the persecutor's motivation." Id. at 213 (quoting H.R. Rep. No. 109-72, at 163 (2005)). Relying on dictionary definitions of "incidental" and "tangential," the BIA construed § 208 to require an applicant for asylum to show that a protected ground is more than "incidental, tangential, superficial, or subordinate to another reason for harm." In re J– B– N– & S– M–, 24 I. & N. Dec. at 213.

-7-

Based on this reading of the statute, the BIA held that, even taking Petitioners' testimony as true, Ndayshimiye's conflict with his aunt was "fundamentally a personal dispute" motivated by Musabwasoni's desire to obtain Ndayshimiye's land and sell it for a profit, with any prejudice related to Petitioners' Burundian background playing an "incidental" role. Id. at 215-16. Therefore, the BIA dismissed Petitioners' appeal as to the asylum ruling, also concluding that they were not entitled to withholding of removal or relief under CAT. Id. at 217. On July 23, 2007, Petitioners timely filed a petition for review of the BIA's decision with this court, arguing that their asylum application should have been granted.[1]

## II.

Review of the BIA's interpretation of § 208 is de novo, though we must defer to its reading of the statute where appropriate under Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984). Wang v. Ashcroft, 368 F.3d 347, 349 (3d Cir. 2004). We review the BIA's factual determinations under the substantial evidence standard, affirming them unless the record evidence would compel any reasonable factfinder to conclude to the contrary. Dia v. Ashcroft, 353 F.3d 228, 247 (3d Cir. 2003).

## III.

An alien will be granted asylum in the United States only if

---

[1] Although Petitioners ostensibly challenge the denial of their CAT claim (Opening Br. of Petrs. 2 n.1, 15, 19-20), they do not present any grounds for rejecting the BIA's conclusion that they face no clear probability of torture if returned to Rwanda. (See generally id.)

he or she is a "refugee" who is "unable or unwilling" to return to his or her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); see also Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 483 (1992) (holding that persecution "on account of" a protected category must be "because of" that category). Therefore, a key task for any asylum applicant is to show a sufficient "nexus" between persecution and one of the listed protected grounds.

Prior to the passage of the REAL ID Act in 2005, there was no statutory standard for judging whether persecution was "on account of" a protected characteristic where other, unprotected motivations might explain an applicant's persecution. The BIA and the courts, however, interpreted § 1101(a)(42) to allow for "mixed-motive" persecution, as long as the applicant's protected status was at least one of the causes of the persecution. See Singh v. Gonzales, 406 F.3d 191, 196 (3d Cir. 2005); In re S– P–, 21 I. & N. Dec. 486, 495 (B.I.A. 1996). Along with other circuits, we resolved that an applicant need only show that his or her persecution was caused "at least in part" by membership in a protected group. See Chang v. Immigration & Naturalization Serv., 119 F.3d 1055, 1065 (3d Cir. 1997); see also Deloso v. Ashcroft, 393 F.3d 858, 860-61 (9th Cir. 2005); Mihaylov v. Ashcroft, 379 F.3d 15, 22 (1st Cir. 2004).

In 2005, Congress passed the REAL ID Act. Among other things, the Act amended the INA to include a standard for evaluating evidence of persecution based on mixed motives. As noted above, the paragraph inserted into § 208 provides that an "applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was

or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i), INA § 208 (b)(1)(B)(i). Petitioners now call into question the BIA's interpretation of that "one central reason" standard as requiring an asylum applicant to show that a protected characteristic was more than "incidental, tangential, superficial, or subordinate to another reason for" his or her persecution.

**A.**

In examining the BIA's interpretation of § 208, we must apply the two-step inquiry set out in Chevron. The first step requires us to decide "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If the plain language of the statute is ambiguous, we proceed to the second step and determine whether the BIA's reading of the provision is a reasonable one. Id. at 844. If so, we must let the interpretation stand.

We conclude that the BIA's interpretation of the "one central reason" standard is in error only to the extent that it would require an asylum applicant to show that a protected ground for persecution was not "subordinate" to any unprotected motivation. That particular term is inconsistent with the plain language of the statute, cutting off our Chevron analysis at step one.

Section 208's use of the phrase "one central reason" rather than "the central reason," which, as amicus points out, was a deliberate change in the drafting of this provision, demonstrates that the mixed-motives analysis should not depend on a hierarchy of motivations in which one is dominant and the rest are subordinate. See Amicus Br. 8-10; In re J– B– N– & S– M–, 24 I. & N. Dec. at 212-13. This plain language indicates that a persecutor may have more than one central motivation for his or her actions; whether one of those central reasons is more or less important than another is irrelevant. The BIA acknowledged this in refusing to define a central reason within the meaning of § 208 as a "dominant" motivation. Id. at 212. The same logic forbids an

-10-

interpretation that would impose a mirror image of the rejected "dominance" test: the requirement that a protected ground, even if a "central" reason for persecution, not be subordinate to any other reason.

It is true that some cases have already cited the BIA's interpretation of § 208 without objection to its form. See Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008); Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 340, 345 (3d Cir. 2008); Parussimova v. Mukasey, 533 F.3d 1128, 1135 (9th Cir. 2008); Abdel-Rahman v. Gonzales, 493 F.3d 444, 453 n.12 (4th Cir. 2007). However, of these cases, only Parussimova discussed the mixed-motives standard at any length, and it implicitly supports the excision of the word "subordinate." In Parussimova, though Judge O'Scannlain briefly referred to the BIA's construction of § 208, he went on to state:

> [A]n asylum applicant need not prove that a protected ground was the only central reason for the persecution she suffered. The Act requires that a protected ground serve as "one central reason" for the persecution, naturally suggesting that a persecutory act may have multiple causes. Second, an applicant need not prove that a protected ground was the most important reason why the persecution occurred. The Act states that a protected ground must constitute "at least one" of the central reasons for persecutory conduct; it does not require that such reason account for 51% of the persecutors' motivation.

533 F.3d at 1134 (emphasis added). Though our disapproval of the term "subordinate" is based on a plain reading of the language of § 208, Congress's goal of "resolv[ing] conflicts between fora" by enacting this provision also weighs in favor of a mixed-motives standard that is consistent with this passage from Parussimova. H.R. Rep. No. 109-72, at 162.

-11-

Once the word "subordinate" is removed, we are left with the BIA's reading of § 208 as dictating that asylum may not be granted if a protected ground is only an "incidental, tangential, or superficial" reason for persecution of an asylum applicant. This corrected definition is consistent with the language of the statute.[2] "Central" is relevantly defined as "of primary importance," "essential," or "principal." See Parussimova, 533 F.3d at 1134 (citing Merriam-Webster's Collegiate Dictionary 201 (11th ed. 2003); American Heritage Dictionary 302 (4th ed. 2000)). These definitions are a reasonable foundation for the BIA's conclusion that Congress, in including the term "central," meant to preclude asylum where a protected ground played only an incidental, tangential, or superficial role in persecution. See also Merriam-Webster's Collegiate Thesaurus 117 (1988) (listing "peripheral" as antonym of "central"); Roget's 21st Century Thesaurus 618 (3d ed. 2005) (listing "incidental," "tangential," and "superficial" as synonyms of "peripheral"). In fact, the BIA derived its interpretation from Congress's own words: the conference report for the REAL ID Act stated that the language of § 208 was "almost identical" to a previously proposed regulation that would require a protected characteristic to be more than "incidental or tangential to the persecutor's motivation." H.R. Rep. No. 109-72, at 163 (citing 65 Fed. Reg. 76,588, 76,592 (Dec. 7, 2000)).

By contrast, the plain meaning of this provision and the

---

[2] This interpretation does not, as Petitioners fear, have any impact on what type of evidence an IJ may require to show persecution on a protected ground. 8 U.S.C. § 1158(b)(1)(B)(ii) makes clear that an asylum applicant's credible account may be sufficient to prove that a protected characteristic is one central reason for persecution of the applicant. See also In re J– B– N– & S– M–, 24 I. & N. Dec. at 214 (stating that "testimonial evidence" alone may be used to meet burden of showing persecutors' motivation).

-12-

accompanying conference report contradict Petitioners' suggestion that § 208 simply adopts the pre-2005 requirement that persecution have been motivated "at least in part" by a protected ground. Foremost, the word "central" would be rendered superfluous if asylum could be granted where a protected ground played any part, no matter how small, in motivating the persecution of the applicant. See United States v. Cooper, 396 F.3d 308, 312 (3d Cir. 2005) ("[C]ourts should construe statutory language to avoid interpretations that would render any phrase superfluous.").

Additionally, the conference report cites only pre-enactment cases going beyond the "at least in part" threshold as consonant with the new statutory standard. H.R. Rep. No. 109-72, at 163 (referring to opinions requiring that persecution be motivated "in meaningful part" or "primarily" by a protected ground and another case denying asylum where persecution stemmed "mainly" from some other motivation) (quoting Girma v. Immigration & Naturalization Serv., 283 F.3d 664, 668 (5th Cir. 2002); Ambartsoumian v. Ashcroft, 388 F.3d 85, 91 (3d Cir. 2004); Useinovic v. Immigration & Naturalization Serv., 313 F.3d 1025, 1033 (7th Cir. 2002)). While the report does note that the "statutory standard [of § 208] is . . . in keeping with decisions of reviewing courts," H.R. Rep. No. 109-72, at 163 (2005), the same paragraph states that before the enactment of the REAL ID Act, there was "no uniform standard for assessing motivation," and goes on to make clear that only certain pre-2005 opinions are being given legislative sanction. In particular, the report expresses disapproval of Borja v. Immigration & Naturalization Service, 175 F.3d 732 (9th Cir. 1999) (en banc), a case that relied on the "at least in part" standard. Id. at 736; see also Parussimova, 533 F.3d at 1134 (holding that the enactment of the "one central reason" standard invalidates the Ninth Circuit's prior "at least in part" analysis).

Therefore, we hold that once the term "subordinate" is removed, the BIA's interpretation constitutes a reasonable, valid construction of § 208's "one central reason" standard.

-13-

**B.**

Regardless of the BIA's misstep in interpreting § 208, its denial of Petitioners' application for asylum still stands because it was based on a finding that their Burundian origin was no more than an incidental factor in their persecution, a finding that is supported by substantial evidence in the record. See Gomez-Zuluaga, 527 F.3d at 340. Remand for reconsideration under the corrected mixed-motives standard is therefore not necessary. See Chen v. Gonzales, 434 F.3d 212, 221 (3d Cir. 2005) (denying petition for review of immigration judge's decision without a remand, despite legal error, because result was still supported by substantial evidence); Mahmood v. Gonzales, 427 F.3d 248, 253 (3d Cir. 2005) (holding remand unnecessary where outcome is clear as a matter of law).

Applicants for asylum bear the burden of providing "some evidence of [a motive based on a statutorily protected ground], direct or circumstantial." Elias-Zacarias, 502 U.S. at 483. Here, the BIA affirmed the IJ's holding that Petitioners had not satisfied that burden based on their own testimony that they had enjoyed a conflict-free relationship with Musabwasoni for eight years, without evidence of persecution or harassment of any kind. Only in 2004, when the land dispute arose, did Musabwasoni exhibit any hostility toward Petitioners. Even once this conflict began, the record contains just a few remarks by Petitioners' alleged persecutors referencing their Burundian background, always in the context of telling Petitioners to return to Burundi so that Musabwasoni could take the land.[3]

---

[3] The scenario postulated by the amicus brief, in which a shopkeeper in Nazi Germany peacefully coexists with a neighboring Jewish merchant until some business conflict arises, but then vandalizes the Jewish merchant's shop with religious slurs, is well taken. See Amicus Br. 13. Where such strong evidence of religious hatred in addition to another, non-protected

-14-

Given these facts, it was reasonable for the BIA to conclude that even if Reverien's remarks suggested that Petitioners' persecution might be based on their Burundian background, the eight years of prior peace between Petitioners and Musabwasoni dispelled any inference that such animus was a significant reason for their conflict. Cf. Lie v. Ashcroft, 396 F.3d 530, 535 (3d Cir. 2005) (holding that the use of an ethnic slur during an otherwise ordinary robbery was not enough to show that the robbers acted because of their victim's ethnicity); Amanfi v. Ashcroft, 328 F.3d 719, 724 (3d Cir. 2003) (determining that there had been no persecution where men took the asylum applicant captive after his father, the head of a Christian ministry, denounced their religious practices, as this was simply a "private dispute").[4]

Petitioners argue that Ndayshimiye's and Murekatete's Burundian background was inextricably intertwined with the underlying land dispute, not "incidental" to it: Musabwasoni's resentment of Ndayshimiye for reentering the family and taking land that she apparently viewed as rightfully hers cannot be wholly separated from the fact that Ndayshimiye had been out of contact with his Rwandan relatives exactly because his parents fled to Burundi. However, we have previously held in Ambartsoumian v. Ashcroft, 388 F.3d 85 (3d Cir. 2004), that such factually intertwined explanations for persecution are irrelevant where the proximate motivation for mistreatment of an applicant is not a

_____

motivation is available, it might compel a finding of persecution based on a protected ground. In this case, however, there is simply not the same level of evidence in the record to support Petitioners' claims.

[4] Although these cases pre-date the passage of the REAL ID Act, they remain valid. Lie and Amanfi were denied asylum even under the forgiving "at least in part" standard; to grant asylum to Ndayshimiye and Murekatete under the more demanding "one central reason" test would be illogical.

protected ground.

In Ambartsoumian, Garegin Ambartsoumian, an Armenian man who had been living in Ukraine, sought asylum based on an allegation that he had been persecuted in Ukraine because of his ethnicity. Id. at 91. The court held that any persecution stemmed from Ambartsoumian's inability to speak Ukrainian and his lack of a residency permit to live in Ukraine. Id. Although both of those circumstances could be traced to the fact that Ambartsoumian was Armenian, the court concluded that the adverse treatment he faced did not qualify as "ethnic persecution."[5] Id.

Ambartsoumian thus supports the BIA's decision here. Just as Ambartsoumian's illegal resident status and his lack of fluency in Ukrainian were a product of his non-Ukrainian background, Petitioners' conflict with Ndayshimiye's aunt came about in part because their absence from Rwanda left them disconnected from the family members who had remained there. Yet Ambartsoumian's persecutors would presumably have acted regardless of which particular country he actually came from; similarly, Musabwasoni and her sons seem to have been motivated at most by their resentment of the usurpation of family property by "outsiders," regardless of where those outsiders might have been

---

[5] Petitioners attempt to distinguish Ambartsoumian on the grounds that in that case the IJ found that Armenians did not generally face persecution in Ukraine, a finding that is absent here. However, Ambartsoumian simply referred to that evidentiary deficit as an alternative rationale for upholding the IJ's decision to deny asylum. The opinion affirmed the IJ's two separate findings, that Armenians did not generally face persecution in the Ukraine and that Ambartsoumian in particular was persecuted for reasons besides his ethnicity, as both "well supported" by the evidence, indicating that either would have sufficed as a basis for the ultimate result. 388 F.3d at 91.

born.[6]

Parussimova offers yet another example reinforcing our approach to mixed-motive persecution cases in the wake of the REAL ID Act. In that case, the Ninth Circuit rejected an asylum application similar to that of Ndayshimiye and Murekatete. Parussimova, a Kazakhstani citizen of Russian heritage, had been attacked by two men while walking alone on the street. They berated her for her work with an American company (evidenced by a pin from the company that she was wearing at the time) and told her she was a Russian pig and had to get out of the country. 533 F.3d at 1131. The court held that although her assailant's use of an insult related to Parussimova's Russian heritage showed "that the men were aware of [her] ethnicity and used it as a means to degrade her," there was no evidence in the record of a "causal connection between [Parussimova's Russian ethnicity] and the men's attack or the threats that followed afterwards." Id. at 1135. Similarly, in this case the use of threats referencing Petitioners' Burundian background does not prove that their nationality was a cause of their persecution.

Our existing precedent affirms the BIA's denial of asylum here. Furthermore, the BIA's use of an erroneous standard was harmless, as its opinion did not rest on a finding that Petitioners'

---

[6] We can confidently rely on the reasoning in Ambartsoumian because it was specifically cited with approval in the conference report's discussion of the new mixed-motives standard. H.R. Rep. No. 109-72, at 163. The conference report did cite Ambartsoumian specifically for its phrasing of the mixed-motives standard, rather than expressing approbation of all aspects of the opinion. However, even if Congress cited the case without regard to the actual result, Ambartsoumian remains good Third Circuit law since it was evaluated under an analytical approach that is "in keeping with" the standard of § 208. H.R. Rep. No. 109-72, at 163.

Burundian background was subordinate to other reasons for persecution. Rather, the BIA determined that Petitioners' roots in Burundi played only a "tangential" or "incidental" role in their persecution. In re J– B– N– & S– M–, 24 I. & N. Dec. at 216. Ndayshimiye and Murekatete have not pointed to any evidence that would compel us to overturn this reasonable conclusion.

Petitioners' allegation that Musabwasoni was responsible for the cancellation of their visas is insufficient to undermine the BIA's decision. There is nothing in the record supporting what Ndayshimiye has admitted is simply his own belief regarding how the visas came to be cancelled, whereas the government has provided evidence that it simply acted on independent information that Petitioners intended to overstay their visas. We additionally find it difficult to reconcile Petitioners' insistence that Musabwasoni wanted them to leave so she could take possession of their land with the idea that she would stand in the way of their departing Rwanda for the United States.

Finally, though we recognize the BIA's error in referencing a non-existent "political group" claim while failing to explicitly address Petitioners' social group claim, the BIA's decision does indicate that it considered Ndayshimiye's and Murekatete's Burundian nationality and their status as repatriated refugees to be intertwined. See In re J– B– N– & S– M–, 24 I. & N. Dec. at 209 n.2. Furthermore, the BIA clearly concluded that Petitioners' Burundian background, whether it is described as their imputed nationality or their social status as old case-load refugees, played no central role in their persecution. Id. at 216 (citing lack of evidence that Petitioners' "Burundian origins or their status as repatriated refugees was more than a tangential motivation for the threats against them") (emphasis added). Therefore, the BIA's failure to mention the "social group" claim by name does not prevent us from "meaningfully review[ing] its decision" and affirming it on the same grounds as the nationality claim. Vente v. Gonzales, 415 F.3d 296, 302-03 (3d Cir. 2005). Compare Valdiviezo-Galdamez v. Att'y Gen., 502 F.3d 285, 290

-18-

(3d Cir. 2007) (finding IJ's decision inadequate because it did not address asylum applicant's ground for persecution by name <u>and</u> because actual analysis of whether persecution had nexus to protected ground was conclusory).

## IV.

For the foregoing reasons, we will deny the petition for review.