FILED
United States Court of Appeals
Tenth Circuit

October 15, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

KHATANBAATAR ZORIG;
OTGONCHULUUN PANDAAN;
TULGA KHATANBAATAR;
MARAL KHATANBAATAR,

      Petitioners,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

      Respondent.

No. 08-9576
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **PORFILIO**, and **TYMKOVICH**, Circuit Judges.

Lead petitioner, Khatanbaatar Zorig; his wife, Otgonchuluun Pandaan; and

two children, Tulga and Maral Khatanbaatar, are citizens of Mongolia. They

applied for asylum based persecution because of political opinion. An

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Immigration Judge (IJ) denied their application, acknowledging harsh treatment of Zorig at the hands of government officials and others but concluding it was not done because of his political opinion. The Board of Immigration Appeals (BIA) affirmed. Petitioners seek our review of the BIA's final order of removal, urging reversal. Although they make compelling arguments in favor of asylum, substantial evidence supports the BIA's decision and, therefore, we must deny the petition for review.

## I.

**Background Information**

Zorig's experiences in Mongolia must be evaluated against the backdrop of cultural and historical influences. Mongolia was long a nomadic society where the concept of private property was not a fixed community value. The traditional system, which existed through the 1920s, called for tribal leaders to allocate the use of lands, primarily for grazing. Mongolia then became a People's Republic and followed Soviet policies. Under that regime, the Communist Party controlled all land.

In 1990 Mongolia began its transition to a democratic society and a market economy. It developed a constitution providing for private rights to land and adopted civil-law provisions granting land licenses for properties identified for private residential and business uses. The first party in power was the Mongolian People's Revolutionary Party (MPRP), composed primarily of former Communist

party members and officials who renamed themselves as a social-democratic party. Governmental corruption accompanied the reorganizing process.

The opposing Democratic Coalition Party (DCP) won the 1996 election and ruled Mongolia through 2000. The DCP's platform called for an investigation into corruption but, once in power, DCP officials also engaged in unethical practices. Under announced DCP policies, families could receive a license for land they had been using for a residence.

In 2000, the DCP lost the election to the MPRP. The transition in the government led to a period of debate, protest, and turmoil over land issues. MPRP officials took back valuable land rights acquired by some DCP members when the DCP was in power, politicizing (or further politicizing) the land-distribution process. Despite passage of land reforms and an anticorruption law, a "perception of rampant corruption" remains. Admin. R. at 280 (State Dep't Report of Mar. 6, 2007).

**Petitioner's Experiences**

Zorig, a third-generation pilot and also an aeronautical and land engineer lived in Ulaanbataar. He began working for MIAT, the government-owned civil airline, in 1992. That same year, he became an active member of the Mongolian Democratic Party (MDP), a component of the DCP, and served the party as a volunteer board member for his district. In 1998, when the DCP was in power, Zorig started his own restaurant on property where his grandparents had lived.

Under the revised land laws he entered into a five-year lease for the property in January 1999 with the expectation of eventual ownership. Zorig also continued to work for MIAT.

In 2002 the MPRP party returned to power. Individuals connected with MPRP began reorganizing MIAT. Zorig's flight and engineering schedules were reduced and his whistle-blowing efforts discouraged. He was listed for a two-month training session in Amsterdam beginning in February 2003, but shortly before his departure his boss cancelled his training. Zorig went anyway, at his own expense. He expected to be fined for this action on his return; instead he was fired.

Shortly after the termination of his employment, Zorig was served with a summons to appear at the police station, an unusual occurrence. He went to the station where, for one to two hours, he was asked questions about the restaurant land. In obedience to police summonses he returned to the station three to five more times, but was always asked the same questions. "[A]t the end, [he] didn't go there when they called [him]." Admin. R. at 129. During this time period, criminals came to his restaurant, attempted to get free food and drink, and told him his business would soon close. Zorig and his wife speculated that a MPRP member wanted to start a business on the restaurant land.

In June 2003, the police came to his house and took him to a detention center. They referred to his membership in the MDP and accused him of

obtaining the land illegally. The police told Zorig the land he occupied would be taken from him when the new land law took effect, so he should "give up this land now and sign on the contract." *Id.* at 132. When he refused to sign the document and asked for an attorney, he was handcuffed and beaten with a long rubber rod. The next day his brother took him from the detention center to the hospital, where he remained for two weeks. He had a concussion, foot problems, and a neck injury.

He left the hospital in July 2003, stayed at his parents' house, and ceased operation of the restaurant. He immediately arranged to leave the country, abandoning any claim to the land. The family entered the United States in September 2003, with authorization to stay until March 21, 2004. He filed a timely application for asylum and restriction on removal based on political opinion and membership in a social group. He also sought relief under the Convention Against Torture. Both Zorig and his wife have family in Mongolia but Zorig does not claim, and the record contains no indication of, oppression of the relatives. Zorig maintains he would be in danger upon his return as long as the MPRP remains in control of the government.

**Administrative Proceedings**

Zorig's evidentiary hearing before the IJ began on August 24, 2006, but was not completed that day. A continued hearing was scheduled for March 22,

2007, at which time the government attorney failed to appear due to a calendaring error. The hearing eventually concluded on May 7, 2007.

Zorig testified at the first hearing; his wife and an expert in Mongolian history and politics testified at the second. Principally they claimed Zorig had suffered persecution because of his political beliefs. At the close of testimony and argument, the IJ reviewed the evidence, emphasizing indications of "a commercial or financial motive in the mistreatment" of Zorig and the existence of "a 'spoils system' in effect in Mongolia." *Id.* at 64-65. The IJ concluded Zorig's "claim, which is based on harm inflicted or to be inflicted due to a claim of property ownership" did not constitute "a claim that can be said to be tied to one of the protected grounds." *Id.* at 65-66. The IJ attributed Zorig's employment problems to the downsizing of the airline.

The IJ denied asylum and restriction on removal. *Id.* at 66. As to relief under the Convention Against Torture, the IJ concluded Zorig's abandonment of the contested property meant the police or governmental officials would not "be interested in harming him much less actually torturing him should [he] return to Mongolia." *Id.* In a separate statement, the IJ elaborated on his decision, explaining to petitioners and their attorney that he

> did believe that most of what you tell me was . . . basically true.
> I just didn't think that the police and the government of Mongolia
> [were] interested in harming you because of your political
> opinion. . . . I think that there were just people that wanted to take
> your property from you and also you lost your job because you

weren't with—you didn't know the higher ups in your company and they were downsizing and so you ended up being a victim.

*Id.* at 264.

Petitioners appealed to the BIA, arguing the IJ misconstrued evidence and wrongly concluded Zorig failed to establish persecution on account of his political opinion. They argued the government's motives were mixed, "and in addition to wanting to extort property from him for monetary gain, Zorig was punished on account of his membership in the Democratic Party." *Id.* at 28-29. They also claimed the lengthy gap between the first and second hearing violated Zorig's due-process rights.

The BIA issued a short, single-member order affirming the IJ's decision. It set forth the appropriate standard of review, summarized the evidence, and announced its conclusions. In summarizing the facts the BIA mischaracterized some of Mr. Zorig's testimony, stating Zorig admitted "he did not follow the rules with respect to getting land." *Id.* at 3. In actuality, Zorig testified the police had accused him of obtaining the land illegally, *id.* at 132, but he had filed a proper application for the land that his grandparents used, *id.* at 125, 128, 132. The BIA, however, accurately described Zorig's testimony about individuals wanting to take his land and business away.

Like the IJ, the BIA rejected the asylum and restriction-on-removal claims for failure to link mistreatment to political motives and further stated Zorig had

"not demonstrated a sufficient likelihood of persecution necessary for asylum. *See Tsevegmid v. Ashcroft*, 336 F.3d 1231 (10th Cir. 2003) (holding that Mongolian applicant not entitled to withholding of removal where he failed to link beating to political motives and did not know who attacked him)." *Id.*[1] As a final matter, the BIA concluded the due-process claim (based on the delay and bifurcated hearings) failed to demonstrate prejudice.

## II.

In his petition for review Zorig lists five issues. We will address them, seriatim, but first recount the burden of proof and our standard of review. To qualify for asylum, an alien has the burden of showing he "has suffered past persecution or has 'a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A) (quotation and alteration omitted)). We review the BIA's legal conclusions de novo. *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006). The agency's factual findings are reviewed for substantial evidence and we may reject them only if "the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Sarr v. Gonzales*, 474 F.3d 783, 788-89 (10th Cir. 2007) (quotation omitted). "[A]n appellate court

[1]    *Tsevegmid* has been superceded on other grounds by statute, 8 U.S.C. § 1252(a)(2)(D)

-8-

must look to the record for 'substantial evidence' supporting the agency's decision: Our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Id.* at 788 (quotation and alteration omitted). "We do not weigh the evidence or evaluate the witnesses' credibility." *Id.* at 789 (quotation omitted). "[T]he ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution." *Hayrapetyan v. Mukasey*, 534 F.3d 1330, 1335 (10th Cir. 2008) (quotation omitted).

**Economic harm, contested standard, and due-process analysis**

Three of Zorig's issues may be addressed and rejected without lengthy analysis. First, he argues the IJ failed to appreciate the severe and pervasive economic harm he suffered at the hands of Mongolian officials. He claims it amounted to persecution. *See Vicente-Elias v. Mukasey,* 532 F.3d 1086, 1088-89 (10th Cir. 2008) (describing standards for determining whether alien's economic loss supports a finding of persecution). Because he did not present this issue to the BIA, his failure to exhaust administrative remedies precludes our review. *Sidabutar v. Gonzales*, 503 F.3d 1116, 1118 (10th Cir. 2007).

Zorig also makes an argument based on the BIA's citation to *Tsevegmid*, 336 F.3d at 1235-36, which discussed restriction on removal in connection with a

Mongolian applicant. He asserts the *Tsevegmid* citation demonstrates an erroneous application of the restriction-on-removal standard to his asylum claim. This theory is based on differing probabilities of persecution: an asylum applicant must demonstrate "a well-founded fear of persecution," but a restriction-on-removal applicant must meet the more demanding standard of "a clear probability of persecution" upon his return. *Wiransane v. Ashcroft*, 366 F.3d 889, 893-94 (10th Cir. 2004). Both forms of relief, however, insist the harm result from persecution related to protected status. The asylum statute requires Zorig to demonstrate that his persecution was inflicted "on account of . . . political opinion." 8 U.S.C. § 1101(a)(42)(A). Although the BIA could have been clearer, a reading of the BIA's decision indicates that it was citing *Tsevegmid* to illustrate the necessity of a causal connection. The BIA did not apply an inapplicable standard to Zorig's asylum claim.

A further argument is that Zorig was denied due-process protection because the hearing was held in two parts, separated by a significant delay. Moreover, neither the IJ nor the parties had a recording or transcript of the first part available at the second part; the IJ had to rely on his notes of Zorig's testimony. A petitioner, however, must show prejudice to establish a due-process violation. *See Berrum-Garcia v. Comfort*, 390 F.3d 1158, 1165 (10th Cir. 2004). And Zorig's explanation of how the time-gap prejudiced him is quite conclusory. He states only that the delay "resulted in confusion on complex factual issues and

-10-

errors of law that denied Zorig the Due Process to which he was entitled." Aplt. Br. at 37; *see also* Reply Br. at 17 (stating alleged errors in IJ's decision show "'confusion' and inherent violation of due process"). This argument does not demonstrate the requisite prejudice.

**Application of mixed-motive standard to evidentiary record**

Zorig asserts that the IJ failed to apply the proper standard to the evidence in this mixed-motive case. The BIA's single-member order, however, referred to the appropriate mixed-motive standard. And "where the BIA decision contains a discernible substantive discussion that stands on its own and does not explicitly incorporate or reference the IJ's reasoning, our review extends no further." *Sidabutar,* 503 F.3d at 1123 (quotations and alterations omitted). We discuss the standard applied by the BIA, not the IJ.

The BIA's denial of asylum was premised on the finding that Zorig failed to demonstrate his mistreatment was motivated, at least in part, by political opinion rather than economic considerations.[2] "[A] key task for any asylum applicant is to show a sufficient 'nexus' between persecution and one of the listed protected

---

[2]     Zorig's employment troubles are not convincing evidence of persecution. *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003) (institutional discrimination does not constitute persecution). The land-contract incident, however, is a different matter. It involved an arrest, restraint, a beating at the hands of police officers, and hospitalization. His mistreatment was severe enough to constitute persecution. *See Kapcia v. INS*, 944 F.2d 702, 708 (10th Cir. 1991) (recognizing that "'beatings, arrests, and assaults' [c]ould be enough to establish past persecution").

grounds." *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009). In instances of mixed-motives, the applicant need not show persecution solely on account of a protected ground, but must demonstrate that at least one of the persecutor's motives falls within a statutorily protected ground. *Id.*; *Rivera v. U.S. Att'y Gen.*, 487 F.3d 815, 821 (11th Cir. 2007); *Menghesha v. Gonzales*, 450 F.3d 142, 148 (4th Cir. 2006); *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005); *Deloso v. Ashcroft*, 393 F.3d 858, 860-61 (9th Cir. 2005); *De Brenner v. Ashcroft*, 388 F.3d 629, 636 (8th Cir. 2004); *Mihaylov v. Ashcroft*, 379 F.3d 15, 22 (1st Cir. 2004); *Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002) (per curiam); *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997); *Osorio v. INS*, 18 F.3d 1017, 1028-29 (2d Cir. 1994); *see also In re S-P-*, 21 I. & N. Dec. 486, 495 (BIA 1996).[3] But "[t]he fact that an actor may have multiple motives does not alter the petitioner's burden to provide sufficient evidence to forge an actual connection between the harm and some statutorily protected ground." *Sompotan v. Mukasey*, 533 F.3d 63, 70 (1st Cir. 2008) (quotation omitted).

---

[3]     Because Zorig applied for asylum before May 11, 2005, he is not subject to a provision of the REAL ID Act of 2005–requiring an alien applying for asylum in a mixed-motive case to show "'that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason'" for the alleged persecution. *Ndayshimiye*, 557 F.3d at 129 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Thus, the mixed-motive analysis previously applied by the BIA and federal courts of appeal remains valid for this case. In any event, application of the new standard would not alter the result.

The BIA did not require Zorig to show his persecutors were motivated solely by his political belief. Rather, it set out the appropriate mixed-motive standard. While Zorig disagrees with the BIA's conclusion, he has not shown the BIA misunderstood the controlling standard. Thus, Zorig's claim of legal error fails.

We acknowledge the brutality experienced by Zorig and recognize the discrepancies in the BIA's summary of his testimony. Nevertheless, the BIA specifically found, as a matter of fact, that financial gain was the fundamental reason for Zorig's mistreatment. While there is contrary evidence, the record also reveals substantial evidence supporting the BIA's finding that, absent his property claim, Zorig would not have be subjected to harm at the hands of government officials. This court may not reverse the BIA's findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Tulengkey*, 425 F.3d at 1280 (quotation omitted). That is not the case here.

## III.

Based on our deferential standard of review of the agency's factual findings, we DENY the petition for review.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

-13-