*122 HARDIMAN, Circuit Judge,
dissenting.
In his petition for review, Rafeeldeen claimed he was beaten by the Sri Lankan government because of his imputed political support for the Liberation Tigers of Tamil Eelam (LTTE). The Immigration Judge and the Board of Immigration Appeals held that Rafeeldeen’s testimony was credible, but nevertheless denied him relief because he failed to establish that the persecution visited upon him was on account of an imputed political opinion. My colleagues reverse the agency by noting that Rafeeldeen showed that his imputed political opinion played more than a “superficial” role in his treatment. Maj. Typescript at 119. Because that standard of review is insufficiently deferential to the agency, I respectfully dissent.
I
The Majority acknowledges, in the first footnote of its opinion, that we review the decisions of the IJ and the BIA for substantial evidence. Although there are appeals in which “the name given to the standard of review may be more symbolic than outcome determinative,” Mars Steel Corp. v. Cont’l Bank N.A., 880 F.2d 928, 940 (7th Cir.1989) (en banc) (Easterbrook, J.), this is not one of them. Accordingly, I think a more detailed explication of our deferential standard of review is required.
Whether an asylum applicant has demonstrated past persecution based on a protected ground is a factual determination we review for substantial evidence. Mulanga v. Ashcroft, 349 F.3d 123, 131 (3d Cir.2003). And this factual determination is entitled to “broad deference.” Khan v. Att’y Gen., 691 F.3d 488, 496 (3d Cir.2012). “We will uphold the findings of the BIA to the extent that they are supported by reasonable, substantial!,] and probative evidence on the record considered as a whole, and will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the BIA did.” Kayembe v. Ashcroft, 334 F.3d 231, 234 (3d Cir.2003). In other words, “the BIA’s finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it.” Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir.2001) (emphasis added).
Under this standard, Rafeeldeen must show that he is unwilling or unable to return to his country due to “persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42)(A). It is well established that an imputed political opinion qualifies as a protected ground. See Lukwago v. Ashcroft, 329 F.3d 157, 181 (3d Cir.2003). But under the REAL ID Act, Rafeeldeen is required to show that this protected ground was “at least one central reason” behind his alleged persecution. 8 U.S.C. § 1158(b)(l)(B)(i) (emphasis added). This makes evidence of the Sri Lankan authorities’ motive “critical.” Lie v. Ashcroft, 396 F.3d 530, 535 (3d Cir.2005).
A
In my view, substantial evidence supports the agency’s determination that any political opinion imputed to Rafeeldeen was not a central reason for the abuse he suffered. Rafeeldeen was beaten in connection with a police investigation into another man — Jeevakumar—whom the Sri Lankan government believed to be an LTTE spy. Rafeeldeen’s own testimony is *123 replete with statements suggesting that the Sri Lankan police focused on discovering information Rafeeldeen had on Jeeva-kumar. For example, when Rafeeldeen was initially stopped and detained, he was asked “why [he was] accompanying” the tour group and what his “relationship” was with them. App. 94. This investigation did not impute any political opinion to Rafeeldeen. Likewise, with respect to his subsequent re-detention shortly after his initial release, Rafeeldeen explained that the police told him that they suspected Jeevakumar to be an LTTE supporter who had come to the region “to give information to the Tigers.” App. 97-98. The police asked Rafeeldeen “how [he] helped” the Germans and Jeevakumar and ordered him to report to the police station weekly “until they arrest Jeeva Kumar.” App. 99-100 (emphasis added). Once again, the sole motivation of the police, in light of Rafeeldeen’s own words, appears to have been a law enforcement interest in capturing a terrorist suspect about whom the police believed Rafeeldeen had information.
Rafeeldeen’s description of his 2007 run-in with the Sri Lankan authorities likewise displays a single-minded police focus on locating Jeevakumar and his affiliates. As Rafeeldeen recounted it: “[The officer] showed Jeeva Kumar’s ID card and ... he asked me whether the German people brought money to the LTT[E] and how much money [I] got to help them. They tortured me and asked me the German people’s address.” App. 104. By all appearances, the authorities pursued Rafeel-deen because they believed he had information on Jeevakumar, not because they imputed disfavored political views to him. Indeed, Rafeeldeen told the IJ that his concern after his release was that “if [the police] don’t arrest Jeeva Kumar, they’re definitely going to take me again.” App. 106. And finally, when the IJ asked Raf-eeldeen whether the “only questions [the authorities] wanted [Rafeeldeen] to answer [were] where Kumar was and how they could find him,” Rafeeldeen undermined his own case by responding: “I think so.” App. 123.
Obviously, the police suspected Rafeel-deen of hiding something and used deplorable tactics in order to prompt him to give up the goods on Jeevakumar. But it is far from clear that the .police actually attributed a political view to Rafeeldeen and a reasonable factfinder could conclude they did not. Hence, I would hold that substantial evidence supports the agency’s conclusion that an imputed political opinion was not a central reason motivating Raf-eeldeen’s mistreatment.
In this respect, the Majority compounds its standard-of-review error with another: its confusion of the “central reason” component of the analysis. The Majority purports to require Rafeeldeen to “show that an imputed political opinion was at least a principal reason for his treatment,” Maj. Typescript at 119, but it actually requires much less. As I shall explain, there is little evidence that imputation of a political view was a principal motivation of the Sri Lankan authorities — certainly not enough to render the agency’s conclusion unreasonable.
Drawing on our decision in Ndayshimi-ye v. Attorney General, the Majority seems to suggest that under the “central reason” test, imputation need only be more than “ ‘incidental, tangential, or superficial’ as a motive.” Maj. Typescript at 119 (quoting 557 F.3d 124, 130 (3d Cir.2009)) (emphasis added). I cannot agree.
In Ndayshimiye we affirmed the' BIA’s interpretation that “the protected ground cannot play a minor role in the alien’s past mistreatment or fears of future mistreatment” and “cannot be incidental, tangen *124 tial, [or] superficial.” In Re J-B-N & SM-, 24 I. & N. Dec. 208, 214 (BIA 2007). But in agreeing with the BIA that a central reason “cannot be merely ‘incidental or tangential to the persecutor’s motivation,’” id., we did not equate a “central” reason with one that barely surpasses the “incidental, tangential, or superficial.” After all, we explained that “central” means “of primary importance,” “essential,” or “principal.” Ndayshimiye, 557 F.3d at 130.[1] Although we recognized that “Con-' •gress, in including the term ‘central,’ meant to preclude asylum where a protected ground played only an incidental, tangential, or superficial role in persecution,” we did not hold that anything beyond the latter descriptors — which we classified as “antonym[s] of ‘central’ ” — automatically confers centrality. Id. Stated differently, the fact that A and B are polar opposites does not mean that C must be one or the other. Rather than exploring the scope of the space between the two poles, we simply stated that “the word ‘central’ would be rendered superfluous if asylum could be granted where a protected ground played any part, no matter how small, in motivating the persecution of the applicant.” Id. at 131 (emphasis added). That’s a far cry from defining “central” as anything more than “incidental, tangential, or superficial,” as the Majority effectively does today. Maj. Typescript at 119.
B
In any event, to the extent that the Sri Lankan authorities associated Rafeeldeen with the LTTE, substantial evidence supports the conclusion that any political attribution was not a more-than-superficial reason for their harsh treatment of Rafeel-deen. As I explained previously, the record suggests that the police focus remained on ascertaining the whereabouts of Jeevaku-mar. In concluding that Rafeeldeen established imputation, the Majority notes that Rafeeldeen testified that Sri Lankan authorities had called him a “Tiger supporter” and a “traitor,” and had “ ‘curse[d]’ him because he is a Tamil-speaking Muslim who ‘helped the LTTE.’ ” Maj. Typescript at 119 (quoting App. 103, 106, 108). The Majority also relies on Rafeeldeen’s credible testimony that he believed that the authorities suspected him of “being part of the LTTE, even a spy.” Id. (quoting App. 119). In addition, the Majority finds it significant that Rafeel-deen was re-detained in 2007 and released only on the condition that he report weekly for questioning until Jeevakumar’s capture.
The Majority’s analysis of these portions of testimony ignores important context. Rafeeldeen did testify that a Sri Lankan officer accused him of being a “Tiger supporter” during his 2007 detention — the strongest piece of testimony in his favor — but the Majority overlooks the fact that this statement was made in the context of that officer’s display of Jeeva-kumar’s ID card and his demands that Rafeeldeen disclose whether the Germans brought money to the LTTE, how much money Rafeeldeen received from them, and where the suspects were located. And although Rafeeldeen was scolded as a “traitor” in the course of his weekly reports to the police station, App. 106, “there is no reason to believe that the ‘traitor’ label applied by police reached beyond the accusations that [Rafeeldeen] helped [suspected] terrorists, [or] had information regarding their activities.” (Kamalpal) Singh v. Holder, 764 F.3d *125 1153, 1167 (9th Cir.2014) (George, J., dissenting in part and concurring in part). The evidence suggests that the police conduct amounted to “interrogation to gain information” about Jeevakumar — not interrogation imputing that Rafeeldeen’s political opinions “made him a terrorist suspect.” Id. That Rafeeldeen credibly testified that he personally believed that the authorities suspected him of “helping] the LTTE” and “being part of the LTTE,” Maj. Typescript at 119 (quoting App. 108, 119), is of no moment. “[W]e accept [Rafeeldeen’s] recitation of the facts” — not the subjective, quasi-legal inferences he draws from those facts. Lukwago, 329 F.3d at 164.
The Majority also reads too much into Rafeeldeen’s 2007 re-detention. The fact that the police retained interest in Rafeel-deen and asked him to report to them weekly until Jeevakumar was arrested does not mean that they imputed to him a political opinion. Indeed, “[i]t is a case of the police taking [Rafeeldeen’s experience with] a suspected terrorist to its logical extension — that [he] would have useful information about that terrorist. That the police crossed all boundaries in pursuing that lead does not change the factor motivating them.” (Kamalpal) Singh, 764 F.3d at 1167 (George, J., dissenting in part and. concurring in part). In sum, there is little reason to believe that the basis for the statements and accusations cited by the Majority went beyond the authorities’ interest in gaining information about Jee-vakumar and his companions. And even assuming, arguendo, that this were the better view, the record does not compel the conclusion that a principal reason for Rafeeldeen’s mistreatment was an imputed political opinion.
Finally, I am unpersuaded by the authorities cited by the Majority. It is true that in (Kulvier) Singh v. Gonzales, even though “the police also had a legitimate law enforcement motivation,” Maj. Typescript at 119, we concluded that their actions were “motivated in significant part by the police’s desire to punish Singh and his father for the father’s political activities regardless of any legitimate law enforcement purpose,” 406 F.3d 191, 198 (3d Cir.2005). But the similarities stop there. Under the pretense of searching for illegal weapons, the Indian police beat Singh and his father, repeatedly mentioning his father’s Sikh separatist political activism, chastising Singh and his father for his father’s continued failure to stop his activism despite prior beatings and warnings, and threatening that if the father did not cease his political activities, they would kill Singh. Id. at 194. Here, in contrast, the authorities’ references to the LTTE when interrogating Rafeeldeen reflect insistence that he provide them information on Jee-vakumar; they do not compel the conclusion' that the police actually imputed LTTE views to Rafeeldeen and were centrally motivated by that imputation in mistreating him.[2]
*126 My colleagues are correct that the Ninth Circuit case of (Kamalpal) Singh v. Holder is uncannily similar to this one. But I find Judge George’s dissent in that case much more persuasive. There, as here, the fact that “the authorities’ questioning was single-mindedly focused on eliciting information about a suspected terrorist,” Maj. Typescript at 120, should be disposi-tive under substantial evidence review guided by a proper understanding of the centrality standard.[3] Singh’s “uncontro-verted answers show[ed] that he was persecuted ‘only’ because he had employed [a suspected terrorist (Khan)] and because the police wanted to find out information regarding Khan.” (Kamalpal) Singh, 764 F.3d at 1165 (George, J., dissenting in part and concurring in part). And there, as here, “[t]he lack of interest by police in Singh’s political opinion [wa]s only punctuated by the fact that the police released Singh after each arrest and interrogation upon the payment of a bribe.” Id. at 1168 (George, J., dissenting in part and concurring in part). This behavior is, at least on one reasonable view, inconsistent with persecution based on imputed political opinion.
In this vein, the Majority suggests I oppose the view that “it is not what the Sri Lankan authorities asked Rafeeldeen about (Jeevakümar), but why they were asking the questions (because they mistakenly believed Rafeeldeen was an LTTE supporter) that determines our outcome.” Maj. Typescript at 120. Not quite. My disagreement lies not in the Majority’s articulation of this principle, but in its application of it. By using the phrase “on account of,” the REAL ID Act undoubtedly “makes motive critical.” I.N.S. v. Elias-Zacarias, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Consequently, our inquiry should focus on why the authorities pursued Rafeeldeen. Because we cannot discern with clairvoyance the subjective motivations of the Sri Lankan police, we must examine what the authorities asked Rafeeldeen in order to arrive at an inference of why they mistreated him. For this reason, we require asylum applicants to “provide some evidence of [motive], direct or circumstantial,” id. — a “what” that is lacking in this case.
As I have explained/I do not find the evidence of imputation and motivation compelling enough to render unreasonable the agency’s conclusion that an imputed *127 political belief was not a central reason behind Rafeeldeen’s mistreatment. Indeed, denying Rafeeldeen’s petition would accord with our precedents in this area. See, e.g., Amanfi v. Ashcroft, 328 F.3d 719, 727 (3d Cir.2003) (mere “mention of religion in the fabric of the story [of the alleged persecution] is insufficient to establish a persecution claim”); Shardar v. Ashcroft, 382 F.3d 318, 324 (3d Cir.2004) (finding that substantial evidence supported the denial of asylum even though officers made politically motivated comments while beating the applicant because the evidence suggested that he “was not persecuted on account of his political opinion; rather, he was legitimately prosecuted for participation in a violent political demonstration”). Accordingly, I would hold that the agency did not err when it determined that Rafeeldeen failed to establish that the Sri Lankan authorities attributed a political view to him and were centrally motivated by that attribution in persecuting him.
II
Because I believe that substantial evidence supported the agency’s conclusion that Rafeeldeen did not carry his burden to show past persecution on a protected ground, he was not entitled to a rebuttable presumption that he has a well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1); Toure v. Att’y Gen., 443 F.3d 310, 317 (3d Cir.2006). Thus, Rafeel-deen had the burden of demonstrating that he has a genuine subjective fear and that “a reasonable person in his position would fear persecution” based on a protected ground were he to return to Sri Lanka. Huang v. Att’y Gen., 620 F.3d 372, 381 (3d Cir.2010).
Here again, the burden of proof and our standard of review are critical. Although I would be inclined to agree with the Majority were the burden on the Government, the burden should fall on Rafeel-deen, and substantial evidence supports the agency’s determination that he did not carry it. The record evidence shows that the Tamil Tigers were defeated in 2009. Although State Department reports indicate that some human rights abuses against LTTE sympathizers linger, there was no evidence that the Sri Lankan government would target Rafeeldeen individually, and he conceded to the IJ that the police have not looked for him for several years. See Quao Lin Dong v. Att’y Gen., 638 F.3d 223, 232 (3d Cir.2011) (upholding the agency’s rejection of an asylum claim where, inter alia, the petitioner had “failed to show that [her persecutors] were still looking for her”). Regardless, even if Rafeeldeen were to establish an objectively reasonable fear that the Sri Lankan authorities would come after him again were he to return to Sri Lanka, for the reasons I have stated, substantial evidence supports the agency’s conclusion that it would not be based on a protected ground.
If we were reviewing this case de novo, I might have no quarrel with my colleagues’ assessment of the evidence that Rafeel-deen was persecuted on account of imputed political opinion and that imputed political opinion was a “central reason” for the persecution. But because we owe “broad deference” to the record, Khan, 691 F.3d at 496, and ask only whether no reasonable person could conclude that Rafeeldeen’s treatment — terrible as it was — was not centrally motivated by a political opinion the Sri Lankan government imputed to him, I respectfully dissent.

. See also Gonzalez-Posadas v. Att'y Gen., 781 F.3d 677, 685 (3d Cir.2015) (“For a protected characteristic to qualify as ‘one central reason’, it must be an essential or principal reason for the persecution.”).

. The other decisions cited by the Majority are inapposite as well. In Ratnam v. INS the police clearly imputed LTTE political views to Ratnam, given that they "repeatedly demanded that he admit to being a Tiger.” 154 F.3d 990, 992 (9th Cir.1998). This imputation was unsurprising in light of the fact that, following a chase, the Sri Lankan navy captured 'Rat-nam on an LTTE weapons-transportation boat, accompanied by two dead Tigers who had ingested cyanide capsules. Id. Likewise, the BIA’s finding of imputation in In re S-P-rested upon distinctive facts — the Sri Lankan army had discovered the asylum applicant in a raid on an LTTE camp (where the applicant had been forced by the LTTE to work), and in his subsequent imprisonment the applicant was "repeatedly accused of being a Tiger.” 21 I. & N. Dec. 486, 487-88 (BIA 1996). Rafeeldeen was not discovered in such compromising circumstances, and his subsequent interrogations naturally reflect references to *126 his knowledge of a suspected LTTE terrorist— but not any imputation of LTTE views to Rafeeldeen himself or mistreatment centrally motivated by such imputation.
Though they are distinguishable on their own terms, is also worth noting that (Kulvier) Singh, Ratnam, and In re S-P- were not "central reason” analysis cases — the relevant test required the persecution only to have been motivated at least in part by a protected characteristic. (Kulvier) Singh, 406 F.3d at 197; Ratnam, 154 F.3d 990 at 996; In re S-P-, 21 I.&N. Dec. at 490-91.

. The (Kamalpal) Singh majority’s characterization of the dissent as making "the extraordinary claim that the police could not have imputed a political opinion to Singh because they interrogated him for information about [the suspected terrorist]” is both wrong and telling. (Kamalpal) Singh, 764 F.3d at 1162 n. 7 (Reinhardt, J.) (emphasis added) (quoted in Maj. Typescript at 120). It’s wrong because it’s a mischaracterization: of course motives can be mixed in the interrogation context, and an improper motive can serve as the basis for asylum if it is also a central one. The dissent merely concluded that the evidence was "devoid of any interest by the police about Singh's own political opinions.” Id. at 1168 (George, X, dissenting in part and concurring in part). The characterization is telling because of its infidelity to the standard of review; our task is not to determine whether the authorities could or could not have attributed a political view; it's whether the agency was compelled to conclude that they did.